691 P.2d 297

**STATE of Arizona, Appellee,**

v.

**David E. BURNS, Appellant.**

No. 6117.

Supreme Court of Arizona,
In Banc.

Nov. 1, 1984.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Ronald L. Crismon, Asst. Attys. Gen., Phoenix, for appellee.

Henry J. Florence, Ltd. by Joel Erik Thompson, Sherry Bell, Phoenix, for appellant.

CAMERON, Justice.

Defendant, David E. Burns, was convicted and judged guilty of first degree murder, A.R.S. § 13–1105. He was sentenced to life imprisonment without possibility of parole for twenty-five years, A.R.S. § 13–703. We have jurisdiction pursuant to Art.

6, § 5(3) of the Arizona Constitution, and A.R.S. §§ 13–4031 and 13–4035.

Defendant raises two issues on appeal:
1. Did the trial court err in refusing to suppress statements defendant made after invocation of his right to counsel?
2. Did the trial court err in precluding the defendant from introducing expert testimony as to the effects of voluntary drug ingestion on his confession?

The facts necessary for a determination of this matter on appeal are as follow. On 27 January 1983, at approximately five o'clock in the afternoon, the defendant stopped by the victim's house in Gila Bend, Arizona, for the express purpose of finding a witness to accompany him to the home of his estranged wife while he picked up his children. The victim was at home with his wife and a friend. The victim and friend drank beer and all three men shared up to one marijuana cigarette. The friend declined the defendant's request to accompany him, but the victim agreed to do so.

The two men left in a Jeep Cherokee belonging to the defendant's father and proceeded to the home of the defendant's wife. She was not home and both men went across the street to the Water Hole Bar where they remained long enough to consume one to two beers apiece. They bought a six pack of beer and left. They proceeded to the end of Stout Road, a desert area bordering farmland, where they were going to drink the beer and smoke marijuana. The victim exited the jeep and, with his back to the defendant, was about to urinate. The defendant distracted the victim so that the victim turned around to face the defendant. The defendant then shot the victim once in the face and again after the victim fell to the ground.

Before going back to his father's home, the defendant drove approximately fifteen miles to the Gillespie Dam where he threw the murder weapon into the waters behind the dam. The following day, the victim's wife inquired of the defendant as to her husband's whereabouts. After the defendant answered that he had dropped the victim off at the victim's home on the prior evening, the victim's wife called in a missing person report. Later that day, Kenneth McLeod, a Maricopa County Deputy Sheriff, stopped the defendant in his car and asked him about the victim. The defendant repeated the story he had told the victim's wife earlier.

The following day, the defendant was involved in an automobile accident near Quartzite, Arizona, some 130 miles from Gila Bend. Defendant may have injured his head in that accident. That night McLeod went to the home of the defendant's father to reinterview the defendant. Although the defendant changed some of the details of his story, he continued to maintain that he had dropped the victim off at the victim's home two nights prior. Later in the evening, the defendant's father went to pick up a horse trailer that he had left in town to be repaired. Upon learning of this, the defendant started to act irrationally and demanded that his brother drive in pursuit of their father. When they caught up, the defendant and his father engaged in fisticuffs.

The defendant then asked his father to take him to see the justice of the peace in Gila Bend. The office of the justice of the peace is located in the same building as the Sheriff's substation. Because of the late hour, the defendant was told that the justice of the peace could not be summoned. He then asked to be put in jail for the night but was told that he could not be incarcerated without a reason.

Deputy Sheriff George W. Watson was summoned to the station to talk with the defendant. Deputy Watson testified at the suppression hearing that the defendant was neither handcuffed nor under arrest and that he was free to leave the sheriff's substation because there was "no indication he [the defendant] had done anything wrong at that time." The defendant, after asking Watson if he was aware of the victim's disappearance, then related the first of three stories concerning the disap-

pearance of the victim. He maintained that they had been ambushed by unknown assailants and that the victim had been shot from a distance. The defendant then agreed to lead Watson to the victim's body, which he did.

After finding the body, the defendant was requested to accompany officers back to the Gila Bend substation so that he could relate his story to a homicide investigator summoned from Phoenix, 64 miles away. Detective Rufino Dominquez arrived during the early morning and the defendant repeated the ambush story. The defendant then became agitated. Although he had not yet been read his *Miranda* rights and allegedly was not a suspect and was free to leave, he demanded an attorney and told Dominquez to "charge me or let me go." Dominquez testified at the suppression hearing that although he would not have been pleased if the defendant had decided to leave the substation, he could not have prevented it because the defendant was not yet a suspect.

At sunrise, Dominquez traveled to the murder scene to investigate. Defendant offered to accompany Dominquez to the victim's body. Dominquez declined the offer and requested, but did not order, the defendant to remain at the substation. The defendant was left in a conference room at the substation unrestrained and unguarded.

After viewing the body, Dominquez concluded (erroneously) that the victim suffered a close contact wound. Because this differed from the defendant's account, Dominquez, upon returning to the substation, read the defendant his *Miranda* rights. Dominquez testified:

Q Did you ask whether or not he understood those rights that you told him?

A Yes.

Q And what was his answer?

A He indicated verbally he understood the rights.

Q Did you then ask him if he would give you a statement as to what happened to Mr. McIntyre?

A Yes, I did.

Q What did he tell you?

A He stated that he would.

Defendant then related to Dominquez the second version of what had occurred. Defendant stated that he shot his wife and the victim because he thought they were having an affair. The defendant then requested an attorney and questioning ceased except for information needed to book the defendant.

After the information necessary for booking was obtained, the defendant initiated a conversation with Dominquez by expressing concern for his son. Dominquez testified:

A And he wanted to know, maybe his wife had left the baby with the babysitter named Maria and that this Maria is a subject who could be located in the trailer court there in Gila Bend.

Q What did you say?

A I then asked him if we couldn't find his baby with this babysitter, where else could we check.

\* \* \* \* \* \*

Q So, you asked Mr. Burns if the baby couldn't be located with this woman in Gila Bend, where else could you look?

A Yes.

Q What did he say?

A There was a possibility that Vicky could have taken his son to the in-laws in Houston. Then he said, "No, she is alive."

Q Then he said he didn't shoot his wife?

A Right.

\* \* \* \* \* \*

Q After this discussion about the baby and wife not being dead, in fact, did he then ask you something about charges?

A Yes.

Q What was it that he asked you?

A If he was going to be charged.

Q What did you tell him?

A That he was.

Q What happened then?

A At that point he said, "Well, I want to tell you what happened."

Q Then what did you tell him?

A I told him he could exercise his right to an attorney. For me to ask him any further questions, he would have to waive that right.

Q What did he say about waiving his right to a lawyer?

A He indicated he would waive his right, wanted to tell me what had happened.

Q Did he then go into the substance of what had happened to Daniel McIntyre?

A Yes.

Q Did he say anyting about the shooting occurring near where the body was located?

A Yes, he did.

Q What did he say?

A That the shooting occurred in that immediate area.

Q Did he say anything about Daniel McIntyre urinating or being out of the car urinating?

A Yes.

Q What did he say?

A He stated that he had waited for McIntyre to exit the vehicle and stand on the edge of the road, waited for him to start urinating when he shot him.

In ruling on the motion to suppress, the trial court ordered that the information obtained during the booking be suppressed but allowed defendant's other statement to be admitted. From the verdict and judgment of guilt, defendant appeals.

## ADMISSIBILITY OF DEFENDANT'S STATEMENTS

Defendant asserts that the trial court committed reversible error by failing to suppress all statements made after invocation of his right to counsel. We do not agree.

■ At the outset, we note that the defendant was advised of his *Miranda* rights after Detective Dominquez returned from the murder scene. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Prior to that time, *Miranda* warnings were not required because the defendant, although being questioned, was not in custody and was not a suspect. He was in a conference room at the Gila Bend Substation and was free to leave at any time. Under the totality of the circumstances, a reasonable man would not have felt deprived of his freedom. Accordingly, *Miranda* warnings were not required at this stage and solicitation of information was clearly permissible. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307–08 (1980).

■ As to the statements made after being "booked," we believe the statements were spontaneous on the part of the defendant. Spontaneous statements volunteered by a defendant who has been advised of his rights are admissible. *E.g., Rhode Island v. Innis,* supra, at 300, 100 S.Ct. at 1689, 64 L.Ed.2d at 308; *State v. Harding,* 137 Ariz. 278, 288, 670 P.2d 383, 393 (1983), cert. denied, — U.S. —, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984).

Defendant, however, has cited several authorities which he claims hold otherwise. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *State v. Ashelman,* 137 Ariz. 460, 671 P.2d 901 (1983); *State v. Routhier,* 137 Ariz. 90, 669 P.2d 68 (1983), cert. denied, — U.S. —, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984); *State v. Hensley,* 137 Ariz. 80, 669 P.2d 58 (1983); *State v. Finehout,* 136 Ariz. 226, 665 P.2d 570 (1983); *State v. Emery,* 131 Ariz. 493, 642 P.2d 838 (1982). We have examined each of these cases and find them to be inapposite. In each case, the condemned misconduct was police initiation of interrogation of an accused who had previously invoked his right to counsel. In the instant case, it was the defendant who initiated further discussion with Detective Dominquez.

■ We believe the facts of *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), are closer to this case than the authorities cited by defendant. In *Bradshaw,* the respondent was arrested and read his *Miranda* rights. He invoked his right to confer with counsel, and all discussion ceased. He then asked a police officer, "Well, what is going to happen to me now." Respondent was again read *Miranda* rights which he waived before confessing to the crimes charged. Under these facts, the United States Supreme Court stated:

> Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation. That the police officer so understood it is apparent from the fact that he immediately reminded the accused that "you do not have to talk to me," and only after the accused told him that he "understood" did they have a generalized conversation. Pet. 11. On these facts we believe that there was not a violation of the *Edwards* rule.

*Id.* at ——, 103 S.Ct. at 2835, 77 L.Ed.2d at 412–13. Likewise, in the instant case, when the defendant initiated the conversation and then said, "Well, I want to tell you what happened," Dominquez reminded defendant that he "could exercise his right to an attorney," and before he could be asked any further questions he would have to waive his right to an attorney. We believe *Oregon v. Bradshaw,* supra, is dispositive of this question. We find no error in the trial court's failure to suppress the defendant's statements.

## EXPERT TESTIMONY

Defendant next charges that the trial court erred in precluding him from introducing expert testimony to the jury as to the effects that drugs may have had on his confession. Defendant concedes that expert testimony on the effects of alcohol consumption may be inadmissible for the purpose of disproving specific intent because these effects are within common knowledge and experience. *State v. Hicks,* 133 Ariz. 64, 649 P.2d 267 (1982); *State v. Laffoon,* 125 Ariz. 484, 610 P.2d 1045 (1980); *State v. Means,* 115 Ariz. 502, 566 P.2d 303 (1977). Defendant contends, however, that expert testimony on the effects of LSD and other drugs is admissible because such effects are not within common knowledge and experience. Defendant cites a Court of Appeals decision for this proposition, wherein the court stated:

> If the effects of the intoxicant are within common knowledge and experience, the trial court does not err in precluding such expert testimony. Here the intoxicant was not alcohol as was the case in *Laffoon* and *Means.* We do not believe that the effect of LSD on the human mind is necessarily within the common experience and knowledge of the jury.

*State v. Betancourt,* 131 Ariz. 61, 62, 638 P.2d 728, 729 (App.1981) (citations omitted). *See also Fouts v. State,* 374 So.2d 22 (Fla. App.1979) (expert testimony on the effects of LSD would have been crucial to the defense, therefore, such testimony should not have been excluded). It should be noted that defendant's contemplated use of such testimony in the instant case is somewhat different. In *Betancourt,* supra, the question concerned the effect of LSD on the formation of specific intent to commit the crime. In the instant case, defendant claimed that he falsely confessed because of the effects of LSD. We are then concerned with the effect of LSD upon a defendant's alleged false confession.

■ In a similar case, when the defendant sought to introduce psychiatric testimony as to his state of mind at the time of his confession, the United States Court of Appeals for the Ninth Circuit stated:

> There can be little doubt that, regardless of what weight the jury might have accorded this expert's testimony, it was certainly relevant evidence on the de-

**536**

fendant's mental condition affecting the weight to be given to the confession. It was error to exclude this testimony.

*United States v. Smith,* 638 F.2d 131, 134 (9th Cir.1981). We agree. Where the crux of a defendant's defense is that he falsely confessed because he was under the influence of drugs, the use of expert testimony on this subject is of value to the jury. A defendant should be allowed to present such evidence to the trier of fact and it was error to exclude the testimony.

 We also agree, however, with the disposition of the matter by the federal court as follows:

> An error as to the weight but not the admissibility of a confession is not an error of constitutional dimension. Where a non-constitutional error is charged, the conviction will be affirmed if the error is more probably harmless than not.
>
> This is a case where the evidence of guilt is overwhelming even if the confession is ignored. Under the circumstances the exclusion of the expert evidence was harmless error.

*Id.* at 134 (citations omitted). In the instant case there was overwhelming evidence that the confession was reliable. The victim was last seen alive in the presence of the defendant. The defendant knew exactly where the victim's body could be found. The fact that the zipper of the victim's pants was down is consistent with the defendant's story that he shot the victim after the victim exited the jeep to urinate. Additionally, the defendant knew the number and location of the victim's wounds as well as the caliber of the bullets used.

Under these circumstances, with overwhelming evidence of guilt, we believe that exclusion of the psychiatric testimony was non-prejudicial error. *State v. McVay,* 127 Ariz. 450, 622 P.2d 9 (1980); A.R.S. § 13–3987.

The conviction and judgment are affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and FELDMAN, JJ., concur.