809 P.2d 944

**STATE of Arizona, Appellee,**

v.

**Milo McCormick STANLEY, Appellant.**

**No. CR–87–0289–AP.**

Supreme Court of Arizona,
En Banc.

Feb. 7, 1991.

520

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, and Gerald R. Grant, Phoenix, for appellee.

Kenneth D. Freedman, Copple, Chamberlin & Boehm by Scott E. Boehm, Phoenix, for appellant.

## OPINION

JAMES D. HATHAWAY, Court of Appeals Judge, Department A.

## JURISDICTION

Milo McCormick Stanley (Stanley) appeals from his convictions of two counts of first-degree murder. He was sentenced to death for killing his daughter and to life imprisonment for killing his wife. This court has jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, –4033 and –4035.

## ISSUES

Stanley contends: (1) his confession and subsequent incriminating statements were involuntary and obtained in violation of his constitutional right to legal counsel; (2) the trial court erred in failing to suppress evidence obtained pursuant to the search warrant because it was not issued by a neutral and detached magistrate and because the evidence supporting probable cause was improperly obtained; (3) the trial court should have suppressed the evidence obtained pursuant to the consent search because law enforcement personnel were already on the premises and because the alleged consent was invalid under the circumstances; (4) the trial court should have granted Stanley's motion to voir dire the trial judge for possible bias or prejudice; (5) a change of venue should have been granted; (6) the death sentence imposed for the murder of his daughter was disproportionate and excessive under the circumstances; and, (7) Arizona's death penalty statute is unconstitutional.

## FACTS

At approximately 11:30 p.m. on June 19, 1986, Stanley reported to the Clarkdale Police that his wife and five-year-old daughter had gone for a walk at about 10:45 p.m. and had not returned. Police officers and family members began searching the community for the woman and child.

At about 9:30 the next morning, two of Stanley's wife's sisters went to the business owned by Stanley and his father, a Volkswagen garage. There they saw the car the missing woman had driven the previous evening. Stanley's father gave the women permission to look through the car

and they found one of Stanley's wife's shoes and one of the missing child's shoes. They also noted an offensive odor in the automobile. They reported these findings to the Clarkdale Police Department, telling the officers their sister and niece had worn the shoes the night before.

One of the sisters returned to the garage that afternoon. Finding it locked, she went to Stanley's apartment and asked his mother for the keys. Stanley gave his mother the keys and she gave them to the sister, who then returned to the garage. Looking through the car again, she discovered what she believed to be bloodstains. Later, the second sister arrived at the shop and she too saw the bloodstains. They also reported this to the Clarkdale Police.

Upon receiving this new information, five officers accompanied the sisters to the garage and entered the premises. They found a shell casing to a small calibre firearm and some bloody socks in the car.

At about 5:30 p.m. the same day, officers went to Stanley's apartment and requested that he and his father accompany them to the garage. They obtained written consent from both Stanley and his father to search the garage. While officers continued to search the premises pursuant to the consent given, Stanley agreed to accompany an investigator (Saravo) to the county building for further interviewing regarding his missing wife and child. After advising Stanley of his *Miranda* rights, Saravo asked him for permission to search his apartment. Stanley signed a consent form. During questioning, Stanley stated that he did not wish to say anything more until he could speak with a lawyer. He was extremely emotional at this time.

Meanwhile, pursuant to the signed consent forms, officers searched the garage and discovered a blood-soaked blanket and seat cover in a trash can located inside the business premises. They then returned to the county building to secure a search warrant. While there, they told Saravo what they had found. Saravo communicated to Stanley that foul play was suspected and disclosed the items that had been found at the garage.

Stanley again became extremely emotional and began to cry. After a short while, Saravo asked whether Stanley was all right. Stanley then confessed that he had shot his wife and daughter. The officers questioned him in an attempt to determine whether the victims might still be alive. Stanley responded that they were dead, and the officers asked where the bodies could be found. Stanley then recounted the events of the previous evening and the area where he had hidden the bodies.

During this time, a search warrant had been drafted and the officers sought a magistrate to issue the document. The magistrate was not at home, but his wife was able to contact him and advised him that he was needed at the county building. When he arrived there, he learned that everyone was at the garage. The magistrate then proceeded to the garage, entered, and sat at a desk just inside the door where he reviewed the affidavit and issued the warrant.

Police found the bodies of Stanley's wife and daughter alongside Allen Springs Road at the location indicated by Stanley. Stanley's wife had been shot three times, the child had been shot once.

## CONFESSION AND RIGHT TO COUNSEL

Stanley contends the trial court erred in admitting his statements to the officers because they were involuntary and obtained in violation of his right to counsel. He argues that because he was given his *Miranda* warnings and thereafter invoked his right to counsel, all interrogation should have ceased. *See Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, *reh'g denied*, 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981); *State v. Finehout*, 136 Ariz. 226, 665 P.2d 570 (1983). He asserts that the right to curtail questioning must be scrupulously honored and that a confession is prima facie involuntary, *see Finehout*, 136 Ariz. at 229, 665 P.2d at 573, unless the state shows by a preponderance of the evidence that the confession was voluntarily made.

*See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). Following an evidentiary hearing on the motion to suppress, the trial court found that Stanley's statements to Saravo were voluntarily made.

■ A trial court's ruling on a motion to suppress will not be disturbed on appeal absent clear and manifest error. *State v. Rivera,* 152 Ariz. 507, 733 P.2d 1090 (1987). The trial court determined there was neither a *Miranda* nor an *Edwards* violation because Stanley was not in custody at the time of Saravo's questioning. We agree. *Miranda* warnings are required only when police officers question a suspect who is in custody. *State v. Perea,* 142 Ariz. 352, 690 P.2d 71 (1984). In this case, Stanley received *Miranda* warnings in connection with requests for consent to search the garage and his residence. These warnings were not required. *State v. Dean,* 112 Ariz. 437, 543 P.2d 425 (1975); *State v. King,* 140 Ariz. 602, 684 P.2d 174 (App. 1984).

■ Whether one is in custody is determined objectively: Under the circumstances, would a reasonable person feel deprived of his freedom of action? *State v. Carrillo,* 156 Ariz. 125, 750 P.2d 883 (1988). Factors indicative of custody include: (1) whether the objective indicia of arrest are present; (2) the site of the interrogation; (3) the length and form of the investigation; and, (4) whether the investigation had focused on the accused. *State v. Carter,* 145 Ariz. 101, 700 P.2d 488 (1985).

■ In the present case, law enforcement was activated by a call from Stanley into a search for his wife and daughter when he reported them missing. During the search and investigation, Saravo testified that Stanley was asked if he would accompany Saravo to the county building to "talk to him about, you know, things we had found." Stanley voluntarily agreed to accompany him. He was not handcuffed; indeed, he was told he was not under arrest and was not a suspect. Stanley was wear-ing a hunting knife and was not disarmed. Although the Cottonwood Police Station was not very far from the garage, Stanley was questioned at Saravo's office in the county building, which also was not far from the garage.

At the time of questioning, the investigation's focus was on a search for missing persons initiated by Stanley himself, not on a homicide. While Saravo had suspicions about Stanley, there was no direct evidence of his involvement. Testimony during the hearing on the motion to suppress was unequivocal that Stanley was free to leave. During the interview, he left the office unescorted to get something to drink and use the restroom. He remained in the office once Saravo stated that the interview was terminated and while Saravo was putting away the tape recorder. There was neither a display of weapons nor physical contact or use of language indicating that Stanley's presence or statements were compelled. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497, *reh'g denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). Applying the *Carter* factors to this case, we agree that Stanley was not in custody.

Stanley argues that it is irrelevant whether he was in custody because that only determines if *Miranda* warnings were required. He contends that because he had been given his *Miranda* warnings in conjunction with the consent to search requests, and because he invoked his rights, questioning should have stopped at that time under *Edwards,* 451 U.S. at 487, 101 S.Ct. at 1886, 68 L.Ed.2d at 388.

■ Because no such warnings were required, and because we agree that Stanley was not in custody, the pertinent inquiry is whether his statements were voluntarily made. *Cf. State v. Burns,* 142 Ariz. 531, 534, 691 P.2d 297, 300 (1984) (solicitation of information clearly permissible before defendant was a suspect and when he was not in custody). The state has the burden of proving by a preponderance of the evidence that Stanley's statements were vol-

untary. *State v. Knapp*, 114 Ariz. at 538, 562 P.2d at 711.

In determining whether the state has met that burden, courts must look to the totality of the circumstances surrounding the giving of the confession. Id. In *Colorado v. Connelly*, the Supreme Court stated that confessions will only be excluded as involuntary when there is police misconduct causally related to the confession. 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Such is not the situation in this case. When Stanley stated he wished to speak to a lawyer, interrogation ceased. Nor does the record thereafter disclose the functional equivalent of questioning. In *Rhode Island v. Innis*, the Court explained that functional equivalent encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 308 (1980). Although the definition of "normally attendant to arrest and custody" is not addressed by the Supreme Court, the Ninth Circuit has held that when the police inform "a defendant of circumstances which contribute to an intelligent exercise of his judgment, this information may be considered normally attendant to arrest and custody." *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984); *United States v. Thierman*, 678 F.2d 1331, 1334 n. 3 (9th Cir.1982).

Following Stanley's request for counsel, Saravo's information that some "bloody stuff" had been found in the trash cans at the garage and that appellant's wife and child had probably met with foul play informed Stanley of evidence available and circumstances that would contribute to an intelligent exercise of his judgment. While it is true that Stanley was crying and clearly upset, the words spoken were neither subtly coercive nor designed to extract a confession from him that would not have been given in an unrestrained environment. *See Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458, *reh'g denied*, 483 U.S. 1034, 107 S.Ct. 3278, 97 L.Ed.2d 782 (1987).

Following Stanley's confession, the state asserts that the purpose of Saravo's inquiry about the victims' location was to determine whether they might still be alive. The state argues this was proper under the public safety exception adopted in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). We agree.

■ Moreover, while personal circumstances, such as intelligence and mental or emotional status, may be considered in a voluntariness inquiry, the critical element necessary to such a finding is whether police conduct constituted overreaching. *State v. Lundstrom*, 157 Ariz. 485, 759 P.2d 631 (App.1988), *rev'd in part and vacated in part on other grounds*, 161 Ariz. 141, 776 P.2d 1067 (1989). We believe the record supports the trial court's finding that Stanley's statement "was not the product of force or coercion nor induced by promise or benefit of immunity."

■ Stanley was not questioned for an extraordinary length of time. His taped interview lasted approximately one hour. The remaining statements were made over another thirty- to sixty-minute period. There is no evidence that Stanley was held in any prolonged or deliberate isolation. He was free to get a drink or use the restroom, and although he was emotional, the officers did not continue nonstop, high-pressure interrogation. The taped segments where Stanley is crying and emotional include long pauses with no intervening questions or discussion. He was given an opportunity to compose himself and voluntarily made the statements in question.[1] Once the tape ran out, Saravo testified that because Stanley was still quite emotional and crying, Saravo asked if he was all

---

1. In determining voluntariness, factors such as police concern for a defendant and provision of amenities may be considered. Further, a defendant who is emotional and upset should be given an opportunity to regain his composure. *Lundstrom*, 157 Ariz. at 487–88, 759 P.2d at 633–34.

right, to which Stanley replied, "No." The record reveals the following testimony:

[Saravo]: I said, "What can I do to help you?" And he said, "Shoot me."

Q. And what happened then?

A. I asked him, "Shoot you? Why would I want to shoot you?"

Q. And what did he say?

A. He said, "Because I shot them. Ah, I was drunk out of my gourd. Damn alcohol. We were up on Mingus."

We do not believe these statements were the product of overreaching by Saravo but rather were Stanley's voluntary statements. Saravo's initial inquiry demonstrated reasonable concern for Stanley's distraught condition and conveyed an offer of assistance. Nor do we find overreaching his reaction to Stanley's bizarre response. We do not find clear and manifest error requiring reversal of the trial court's ruling on the motion to suppress. *Rivera*, 152 Ariz. at 513, 733 P.2d at 1096.

■ We conclude (1) that Stanley was not in custody; (2) his sixth amendment rights did not attach; (3) even though a suspect invokes his right to decline further interrogation until he has spoken to a lawyer, the police may continue to question him in a non-custodial setting; and, (4) so long as the responses are voluntary, and his will has not been overborne, the suspect's responses may be used in evidence against him. Accordingly, we find no error in the admission of Stanley's statements.

## ISSUANCE OF SEARCH WARRANT

Stanley argues that the trial court erred in failing to suppress the evidence obtained pursuant to the search warrant because it was not issued by a neutral and detached magistrate. *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *State v. Collins*, 21 Ariz.App. 575, 522 P.2d 40 (1974). He asserts that a neutral and detached magistrate is needed to ensure impartial assessment of the weight and credibility of the information presented to support the issuance of a search warrant.

■ We will not disturb a trial court's ruling on a motion to suppress absent clear and manifest error. *State v. Smith*, 123 Ariz. 231, 599 P.2d 187 (1979). This court views the facts in the light most favorable to supporting the trial court's ruling. *State v. Cook*, 115 Ariz. 188, 564 P.2d 877 (1977). A neutral and detached magistrate is one who has severed and disengaged himself from the activities of law enforcement. *Shadwick v. City of Tampa*, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972).

■ Stanley argues that the magistrate was present at the garage before he issued the search warrant, that he saw numerous police officers already searching the premises, had a full view of the entire garage area, had conversations with one or more officers, and moved items on top of a desk in the area to be searched. Stanley concludes that such conduct is evidence of involvement with law enforcement. He argues that this involvement precluded the magistrate from acting in a neutral and detached capacity, thereby rendering the search warrant invalid.

Stanley cites *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979), in support of the proposition that any evidence seized pursuant to an invalidly issued warrant is tainted and requires suppression. While we agree with that proposition and the authority, we find the facts in *Lo–Ji* distinguishable from those in this case.

In *Lo–Ji*, the magistrate had issued a search warrant and then proceeded to participate with the police in its execution. The record here reflects that the magistrate was not available when initially contacted. He subsequently returned the call but did not have his office key with him, so he told the dispatcher he would meet the police officers at the Cottonwood Police Station. Upon his arrival, he learned the officers were at the garage. He proceeded to the garage and entered a small office area. He did not participate in the search, did not inspect any items of evidence, was not involved with the investigation or prosecution of the case, and had no affiliation with any police department. He signed the warrants based solely on the affidavits be-

fore him. A neutral and detached magistrate does not "lose ... his character as such merely because he leaves his regular office in order to make himself readily available to law enforcement officers who may wish to seek the issuance of warrants by him." *Lo–Ji,* 442 U.S. at 328 n. 6, 99 S.Ct. at 2325 n. 6, 60 L.Ed.2d at 930 n. 6; *see also United States v. Whitehorn,* 829 F.2d 1225 (2d Cir.1987), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988) (magistrate present in FBI office for over six hours before signing warrant during which time he heard radio transmissions was not deemed to have abdicated his neutral and detached magisterial role). While we do not approve a practice in which the magistrate visits the crime scene to study the affidavits, on the unique facts in this case we find no error.

Alternatively, Stanley argues that the search warrant is invalid because the probable cause upon which it was based was improperly obtained. He derives his position from the premise that the evidence supporting the warrant was his confession and that it was obtained in violation of *Miranda* and *Edwards.* Having resolved that issue against Stanley, we find his probable cause argument meritless.

## CONSENT SEARCH

■ Stanley contends that the trial court erred in failing to suppress evidence obtained pursuant to the consent search because law enforcement personnel were already illegally on the garage premises, and the alleged consent was not obtained until the police had been through the garage and examined the car. The state responds that prior to the voluntary completion of the consent-to-search forms by Stanley and his father, Stanley's sisters-in-law had consented voluntarily to the police search of the business premises. Third-party consent removes the warrant requirement if it is voluntarily given and the third party has "common authority" over or other sufficient relationship to the premises or property searched or seized. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974);

*see also State v. Girdler,* 138 Ariz. 482, 675 P.2d 1301 (1983), *cert. denied,* 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 826 (1984); *State v. McGann,* 132 Ariz. 296, 645 P.2d 811 (1982).

Stanley does not dispute that his sisters-in-law invited law enforcement personnel into the garage or that they obtained the key from his mother. His position is that the women giving consent had no real or apparent authority to do so. Further, his mother had no common authority over the property or sufficient relationship to it, thus voiding her consent.

In *State v. Castaneda,* a question of common authority over business premises was raised when defendant's sister consented to a search. 150 Ariz. 382, 724 P.2d 1 (1986). The court held that the test for determining common authority focuses on apparent authority and found that because defendant's sister was a joint owner of the business premises and no rooms on the premises were regarded as private, the police could reasonably infer that she had authority to consent to a search of the premises. *State v. Castaneda,* 150 Ariz. at 389, 724 P.2d at 8.

■ The state contends that because Stanley's sisters-in-law had been given the keys to the business by Stanley through his mother, it reasonably appeared that they had apparent authority to give consent. The record includes the undisputed testimony of one sister-in-law that she obtained the keys from Stanley through his mother and that Stanley knew she intended to use them to open the garage and search the car. While giving keys to another is not a blanket authorization to enter the premises and authorize a search, when circumstances dictate the propriety of doing so, common authority may properly be inferred, exercised and delegated to the police as in this case. *Dover v. State,* 250 Ga. 209, 211, 296 S.E.2d 710, 712 (1982), *cert. denied,* 459 U.S. 1221, 103 S.Ct. 1228, 75 L.Ed.2d 462 (1983). Moreover, the search was a community effort called into action by Stanley, and his sisters-in-laws' participation might reasonably be expected.

Stanley claims that he and his father did not voluntarily consent to the search of the shop. He contends they were completely exhausted and upset and that the officers deceived them by stating that the only reason they were being asked to sign consent forms was to expedite the investigation because a search warrant was on its way to the scene. Stanley insists that, under the totality of the circumstances, their consent was based on a perception that they had no choice but to acquiesce and sign the consent forms.

The record reflects that police officers fully explained to Stanley and his father their constitutional rights, informed them of bloodstains found in the car, and told them they did not have to consent to a search. It was disputed whether the police told Stanley and his father that a search warrant was on the way. "It is for the trial court to resolve conflicting testimony." *State v. Hanson*, 138 Ariz. 296, 301, 674 P.2d 850, 855 (App.1983). Accordingly, we agree with the trial court's conclusion that Stanley and his father voluntarily consented to the search. *See State v. Laughter*, 128 Ariz. 264, 625 P.2d 327 (App.1980).

## VOIR DIRE OF THE TRIAL JUDGE

Stanley filed a motion to voir dire the trial judge, which the court denied because Stanley made no showing of the possibility of prejudice. Stanley contends this was reversible error. He asserts that his right to a fair and impartial trial was denied because he was not able to determine whether the trial judge was biased or prejudiced against him. His position is that, without independent knowledge, he must be allowed to voir dire the judge to make such a determination.

The state responds that there is no constitutional right to voir dire a trial judge. *State v. Rossi*, 154 Ariz. 245, 741 P.2d 1223 (1987); *cf. State ex rel. Corbin v. Superior Court*, 155 Ariz. 560, 748 P.2d 1184 (1987) (impartiality of the judge may be questioned when adversarial proceedings in a criminal case are assigned to a judge who was a member of the staff of the prosecution or defense at the time prosecution

began). In *Rossi*, we stated that a request to voir dire the trial judge based upon the mere possibility of bias and prejudice without more is not encompassed within the constitutional right to a fair trial before an impartial judge. Here, the motion in its entirety included no more than a bald request to voir dire in order to probe for possible bias so that Stanley could file a challenge. We find nothing in the record suggesting that Stanley was denied a fair trial before an impartial judge.

## CHANGE OF VENUE

Stanley argues that the trial court erred in denying his motion for a change of venue. He contends that the extensive pretrial publicity, including the televising of his arraignment, unfairly prejudiced him. He asserts that the publicity had reached outrageous proportions and that prejudice to him could be presumed. In the alternative, he claims that the publicity tainted his ability to have an unbiased jury impaneled and thus deprived him of a fair trial. *See State v. Chaney*, 141 Ariz. 295, 686 P.2d 1265 (1984).

The state responds that Stanley failed to show either outrageous publicity or resulting prejudice from the media coverage and therefore the trial court correctly denied his request for a change of venue. The record does not reflect evidence of a "carnival" atmosphere, that raises a presumption of prejudice. *Chaney*, 141 Ariz. at 302, 686 P.2d at 1272. Stanley therefore had the burden of proving that the pretrial publicity would likely deprive him of a fair trial. That required a showing that jurors had formed preconceived notions of Stanley's guilt that they could not set aside. A juror may not be disqualified merely on a showing that he had prior knowledge of the case. *State v. Befford*, 157 Ariz. 37, 754 P.2d 1141 (1988). "It is the *effect* of publicity on a juror's objectivity that is critical, not the extent of publicity." *State v. LaGrand*, 153 Ariz. 21, 34, 734 P.2d 563, 576, *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987) (emphasis in original); *Chaney*, 141 Ariz. at 302, 686 P.2d at 1272.

In this case, no newspaper articles or other examples of pretrial publicity were attached to Stanley's motion for change of venue. The trial court denied Stanley's motion without prejudice, encouraging defense counsel to renew the motion if appropriate during jury selection. Stanley's counsel did in fact renew the motion on several occasions, and all were denied. The trial took place one year after the crimes were committed. The record reflects that the voir dire was lengthy, conducted individually and as a group, and that counsel had ample opportunity to question potential jurors to ascertain the effect of pretrial publicity on their objectivity. The venireman who could not decide the case solely on the evidence was excused for cause. The venireman who had formed an opinion of Stanley's guilt was also excused for cause. We find no error.

## DEATH SENTENCE

### A. Aggravation/mitigation

The trial court imposed the death penalty for the murder of Stanley's daughter finding three aggravating circumstances at sentencing. Although the court found five mitigating circumstances, it found none sufficiently substantial to call for leniency. In a capital sentencing case, we must independently review the existence of aggravating or mitigating circumstances and determine the propriety of the imposed death penalty. *State v. Stevens*, 158 Ariz. 595, 764 P.2d 724 (1988); *State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 708, *reh'g denied*, 492 U.S. 938, 110 S.Ct. 25, 106 L.Ed.2d 637 (1989); *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101, *reh'g denied*, 434 U.S. 976, 98 S.Ct. 537, 54 L.Ed.2d 469 (1977).

As aggravating circumstances, the court found: That Stanley was convicted of another homicide committed during the commission of this offense, A.R.S. § 13–703(F)(8); that Stanley was an adult and his daughter was under fifteen years of age, A.R.S. § 13–703(F)(9); and, that the offense was committed in a particularly depraved manner, A.R.S. § 13–703(F)(6). Stanley does not dispute the court's finding of aggravating circumstances pursuant to A.R.S. §§ 13–703(F)(8) and 13–703(F)(9). He does argue that the court erred in finding that the offense was particularly depraved. Under the totality of the circumstances, Stanley asserts that the facts of this case are blatantly unlike the sadistic torture-murder cases that this court has found to be depraved and meriting the death sentence. *See, e.g., State v. Gillies*, 135 Ariz. 500, 662 P.2d 1007 (1983), *appeal after remand*, 142 Ariz. 564, 691 P.2d 655 (1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *State v. Bishop*, 127 Ariz. 531, 622 P.2d 478 (1980).

The offense was not found to be cruel but the trial court found shooting the child to meet the test for depraved conduct, which involves the killer's mental state and attitude at the time of the killing. *See Beaty*, 158 Ariz. at 242, 762 P.2d at 529. *State v. Gretzler* listed five factors that could lead to a finding of heinous or depraved conduct: (1) relishing of the murder by the defendant; (2) the infliction of gratuitous violence on the victim beyond that necessary to kill; (3) mutilation of the victim's body; (4) the senselessness of the crime; and, (5) the helplessness of the victim. 135 Ariz. 42, 52–53, 659 P.2d 1, 11–12, *cert. denied* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 *reh'g denied* 463 U.S. 1236, 104 S.Ct. 32, 77 L.Ed.2d 1452 (1983). In addition to those factors, we have also held that the elimination of a witness as a motive for murder may be considered a factor indicating depravity. *See Gillies*, 135 Ariz. at 512, 662 P.2d at 1019. Testimony at trial indicated that Stanley shot his daughter because she had seen what he had done.

The killing of a helpless child is senseless and demonstrates a disregard for human life satisfying two of the five *Gretzler* factors. Her helplessness is apparent because she and her twelve-month-old brother were alone with their parents in an automobile in the foothills of Mingus Mountain. She was dependent for care and

protection upon her parents, and her mother had just been shot. The record reveals that she died from a hard contact wound to the top of her head. The medical examiner testified that a hard contact wound meant the muzzle of the gun had been pressed against the child's head, as evidenced by the circular wound with a pattern of darkening corresponding to the dimensions of the muzzle of the gun.

We have found the killing of a helpless child to be senseless and evidence of an evil state of mind sufficient to indicate depravity. *State v. Wallace,* 151 Ariz. 362, 728 P.2d 232 (1986), *cert. denied,* 483 U.S. 1011, 107 S.Ct. 3243, 97 L.Ed.2d 748 (1987) (killing of twelve- and sixteen-year-old children and their mother with whom defendant had lived for two years supported depravity finding). Even more egregious than the facts in *Wallace* are those in this case because the child was Stanley's own daughter.

Finding that the child was murdered in an "especially depraved manner," the trial judge stated:

> According to the testimony of Mr. Cook, within just a short time after the killings, disposal of the bodies, and attempts to hide evidence, defendant was at Mr. Cook's place of business to rent a racy videotape identified by Officer Saravo later as entitled Best of Anything Goes, a video dealing with a strip game show. Defendant did not appear to be under the influence of alcohol or any drug at the time he rented this videotape, and apparently some time in the next 24 hours before he was arrested had watched part of it.
>
> When these factors are considered together, they paint the picture of a man so depraved that he could kill his helpless five-year-old child, who was completely dependent on him and trusting of his goodwill toward her, kill her for no reason other than to eliminate her as a witness, and then, after rolling her body down a mountainside, sought to idle away his time by indulging himself in watching a strip game show. Beyond a reasonable doubt, the State has proven

that defendant committed the murder of [the child] in an especially depraved manner.

We agree with the trial judge that the child was killed in an especially depraved manner. When a father kills his own child, his actions cannot be characterized as sensible, nor can his state of mind be considered other than perverted. This fact sets this crime apart from the norm of first-degree murders and warrants a finding that the murder was committed in an especially depraved manner. *See, e.g., State v. Moorman,* 154 Ariz. 578, 744 P.2d 679 (1987) (killing own mother above the norm of first-degree murders); *State v. Correll,* 148 Ariz. 468, 715 P.2d 721 (1986) (depravity indicated by senseless murders, unnecessary to the robbery; helplessness of bound and gagged victims shot one at a time with total disregard for human life).

■ The trial court found five mitigating circumstances, but found them insufficient to require leniency: (1) Stanley had a minimal prior criminal history; (2) he was an adequate family man; (3) he had attempted to rehabilitate himself from marijuana and alcohol abuse problems; (4) he had exhibited very little violent behavior or spousal abuse; and, (5) he was remorseful for his crimes. The trial court refused to find that Stanley's chronic drug and alcohol abuse or its use at and around the time of the crimes was a mitigating factor. Stanley had the burden of proof by a preponderance of the evidence to avoid imposition of the death penalty. *State v. Rossi,* 154 Ariz. 245, 741 P.2d 1223 (1987) (*Rossi II*). In *State v. Rossi,* 146 Ariz. 359, 706 P.2d 371 (1985) (*Rossi I*), the sentencing transcript demonstrated that the trial judge erroneously believed that defendant's impairment under A.R.S. § 13–703(G)(1) must have been sufficient to constitute a defense to the prosecution. Accordingly, we remanded for resentencing. The record in the present case reveals no such error. The trial judge considered whether Stanley proved by a preponderance of the evidence that his use of alcohol and/or drugs significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the

law. *Rossi II*, 154 Ariz. at 251, 741 P.2d at 1229; *Wallace*, 151 Ariz. at 369, 728 P.2d at 239; *State v. Tittle*, 147 Ariz. 339, 710 P.2d 449 (1985).

*Rossi II* instructs that A.R.S. § 13–703(G)(1) is stated in the disjunctive and must be considered by the court accordingly. 154 Ariz. at 251, 741 P.2d at 1229. There, the court found that the trial court erred in not finding that defendant had proved by a preponderance of the evidence that his cocaine addiction significantly impaired his capacity to conform his conduct to the requirements of the law. *Id.* An expert in that case gave unrefuted testimony: (1) that the appellant's life was dominated and controlled by drugs; (2) that he would not have committed the crimes had he not been a cocaine addict; (3) that the addiction significantly impaired his capacity to conform his conduct to the requirements of the law; and, (4) that chemical dependency fosters an insatiable and life-controlling craving for additional drugs that overwhelms the user's ability to control his physical behavior. *Rossi II*, 154 Ariz. at 250, 741 P.2d at 1228.

In this case, testimony indicated that Stanley had chronic alcohol and drug problems and had sought help for them. The record reveals testimony at the presentence hearing and in the presentence report that Stanley had ingested at least six wine coolers and eight to ten lines of cocaine in the six hours immediately preceding the killings. However, during the trial, the employee at the Number One Food Stop from whom Stanley rented a videotape following the shootings testified:

Q. All right. Did he appear to you— well, strike that. In the process of your conversation and in the process of renting the tape, how far away were you from him?

A. Foot-and-a-half, two feet maybe.

Q. Did it appear to you that he had been drinking?

A. I didn't get that impression. I didn't have any impression like this.

Q. You couldn't smell anything?

A. No.

Q. He wasn't slurring his speech?

A. No.

Q. He didn't appear to be staggering or anything of that nature?

A. No.

Q. Did he appear to be under the influence of anything?

A. No, nothing that—I took no undue notice of any behavior like that.

We have reviewed all the testimony of the three psychiatrists and the psychologist who examined Stanley. Only one expert testified that Stanley's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired. The other three testified that Stanley knew his conduct was wrong and knew so at the time he committed the crimes. His actions of disposing of the bodies, hiding the bloody blanket and seat cover, hiding the gun, and then calling in a false missing persons report were all purposeful actions and further evidence that he appreciated the wrongfulness of his conduct. Two of the experts testified that Stanley was not suffering from any mental illness that could have prevented him from conforming his conduct to the requirements of the law.

In *Rossi II*, the court found that the appellant had, contrary to the trial court's finding, proved by a preponderance of the evidence that his cocaine addiction *significantly* impaired his capacity to conform his conduct to the requirements of the law. The evidence supporting reversal was the unrefuted expert testimony that Rossi's chemical dependency was so overwhelming as to prevent him from controlling his physical behavior:

At the time of the crime, appellant had a $1,000–per–week cocaine habit and was suffering from "cocaine intoxication with manifestations of delusions and hallucinations of a paranoid nature." And "chronic cocaine abuse.... It wasn't just a matter that he was using cocaine and suffering the effects of cocaine. His whole personality began to evolve around the use of cocaine. That was the central occupation of his life."

154 Ariz. at 250, 741 P.2d at 1228.

The court in *Rossi II* found:

[T]hat appellant proved by the preponderance of the evidence that his cocaine addiction significantly impaired his capacity to conform his conduct to the requirements of the law. We find very persuasive Dr. Nash's unrefuted testimony on chemical dependency in general and how addiction fosters an insatiable and life-controlling craving for additional drugs that overwhelms the user's ability to control his physical behavior.

154 Ariz. at 251, 741 P.2d at 1229.

The evidence in this case shows that although Stanley had a history of chemical abuse, the record does not reflect that it overwhelmed his ability to control his physical behavior. Accordingly, we do not find that the trial court erred in concluding that Stanley did not prove by a preponderance of the evidence that his drug and alcohol problem significantly impaired either his capacity to appreciate the wrongfulness of his conduct or his ability to conform his conduct to the requirements of the law.

**B. Proportionality**

 This review focuses on whether the death penalty is excessive as compared to similar cases, considering the offense and the accused. *State v. Stevens*, 158 Ariz. at 599, 764 P.2d at 728; *State v. Beaty*, 158 Ariz. at 247, 762 P.2d at 534; *State v. Lambright*, 138 Ariz. 63, 673 P.2d 1 (1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). We have reviewed other cases involving murder of a family member. *State v. Moorman*, 154 Ariz. at 580, 744 P.2d at 681 (murder of defendant's mother); *State v. Knapp*, 114 Ariz. at 534, 562 P.2d at 707 (murder of defendant's two young children). We have reviewed cases in which the crime was found to have been committed in an especially heinous or depraved manner under A.R.S. § 13–703(F)(6). *State v. Vickers*, 159 Ariz. 532, 768 P.2d 1177 (1989) (pouring flammable liquid on a physically handicapped man in a locked jail cell upheld as depraved conduct under the last two *Gretzler* factors); *State v. Beaty*, 158 Ariz. at 247, 762 P.2d at 534 (defendant's sexual assault and murder of a thirteen-year-old child found to be depraved because the

crime was senseless and the victim helpless); *State v. Wallace*, 151 Ariz. at 367, 728 P.2d at 237 (senseless murder of helpless, unsuspecting twelve- and sixteen-year-old and their mother found to be depraved).

In cases in which the senselessness of the crime and helplessness of the victims were factors upheld as evidence of depravity satisfying an aggravating circumstance under A.R.S. § 13–703(F)(6), the common thread, regardless of the manner in which the criminal act transpired, is that the conduct by its very nature was especially senseless because it was outside normal behavioral parameters. *Moorman*, 154 Ariz. at 587, 744 P.2d at 688; *Wallace*, 151 Ariz. at 367–68, 728 P.2d at 237–38; *Knapp*, 114 Ariz. at 543, 562 P.2d at 716. Where the helplessness of the victim was considered, the common element was that the victim was totally unable to defend against or resist the accused's actions. *Vickers*, 159 Ariz. at 546, 768 P.2d at 1191; *Moorman*, 154 Ariz. at 587, 744 P.2d at 688; *Wallace*, 151 Ariz. at 368, 728 P.2d at 238; *Knapp*, 114 Ariz. at 543, 562 P.2d at 716. We have also reviewed a case which noted that but for the fact that the crimes had been committed before the adoption of A.R.S. § 13–703(F)(8), another aggravating circumstance would likely have been present. *State v. McMurtrey*, 151 Ariz. 105, 726 P.2d 202 (1986), *cert. denied*, 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 530 (1987). The death penalty was imposed in each case reviewed. Based on those cases and the facts before us in the present case, we find that the imposition of the death penalty is not excessive or disproportionate.

**C. Constitutionality**

Stanley claims that the aggravating factors "cruel, heinous or depraved" as set forth in A.R.S. § 13–703(F)(6) are unconstitutionally vague and arbitrarily and capriciously imposed. The United States Supreme Court has specifically found that our construction of these aggravating factors meets constitutional requirements. *Walton v. Arizona*, —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Lewis v. Jef-*

*fers,* — U.S. —, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). Although the Court in *Walton* found that our aggravating factor "especially cruel, heinous or depraved" is facially vague, where statutory language is too vague to provide guidance to the sentencing court, a reviewing court must look to any narrowing constructions and determine "whether they provide *some* guidance to the sentencer." (Emphasis in original) — U.S. at —, 110 S.Ct. at 3057, 111 L.Ed.2d at 529. On that basis, the Court found that we have given substance to the operative terms through our constructions, and that these constructions are constitutionally sufficient. *Id.; see also Lewis,* — U.S. at —, 110 S.Ct. at 3101, 111 L.Ed.2d at 622.

The remaining challenges to the constitutionality of our death penalty statute are that it lacks standards for evaluating aggravating and mitigating circumstances, that it is cruel and unusual punishment, that the jury takes no part in the sentencing determination, that the prosecutor has the discretion to decide in which cases the death penalty will be sought, and that the burden of proof is placed upon the defendant to prove mitigating factors. Each of these arguments has been presented to this court in the past and rejected. *Vickers,* 159 Ariz. at 543, 768 P.2d at 1188; *Beaty,* 158 Ariz. at 246, 762 P.2d at 533; *State v. Bracy,* 145 Ariz. 520, 703 P.2d 464 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986); *Gillies,* 135 Ariz. at 507, 662 P.2d at 1014.

The convictions and sentences are affirmed.

GORDON, C.J., FELDMAN, V.C.J., and MOELLER, J., concur.

NOTE: Pursuant to Article VI, Section 3 of the Arizona Constitution, The Honorable JAMES D. HATHAWAY and The Honorable ALLEN G. MINKER are designated to sit on this case and participate in the determination of this matter. Justices JAMES DUKE CAMERON and WILLIAM A. HOLOHAN did not participate in this matter.

ALLEN G. MINKER, Court of Appeals Judge, concurring in part and dissenting in part.

I concur with the majority's affirmance of the convictions but write separately because I believe the death sentence in this case is flawed and the matter should be remanded for a new sentencing.

In *State v. Rossi (Rossi II)*, 154 Ariz. 245, 741 P.2d 1223 (1987), this court remanded for resentencing because the trial judge erroneously refused to take into account a mitigating circumstance: that the defendant's capacity to conform his conduct to the requirements of the law was significantly impaired by drug addiction. I believe that the trial judge's refusal in this case to weigh defendant's drug and alcohol use on the day of the murders requires the same result as in *Rossi II.* A.R.S. § 13–703(G)(1) requires that the trial judge weigh as a mitigating circumstance that "the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." *Rossi II* holds that either the capacity to appreciate the wrongfulness of his conduct or the capacity to conform conduct to the requirements of the law constitutes a mitigating circumstance. The burden is upon the defendant to prove this mitigating circumstance by a preponderance of the evidence. 154 Ariz. at 251, 741 P.2d at 1229.

The record in the present case reveals that Milo Stanley had a long history of substance abuse, including abuse of alcohol, marijuana, amphetamines, LSD, and cocaine. He had previously undergone substance abuse counseling. On the day of the shootings, defendant began drinking at noon and during the day used alcohol, marijuana, and cocaine. At the sentencing hearing, defense counsel proffered numerous mitigating circumstances. The trial judge found five of these entitled to consideration as against three aggravating factors, but not impairment from alcohol and cocaine use. I believe the trial court erroneously applied psychiatric testimony

regarding insanity in refusing to consider alcohol and cocaine use.

The trial judge reviewed the testimony of four mental health experts who testified during the trial. The trial judge concluded,

Psychiatric testimony supports the conclusion that defendant did not suffer from any mental disease or defect whether associated with alcohol and drugs or not that could be said to cause the defendant to act as he did. Rather, the conclusion is appropriate that defendant was in control of his mental faculties sufficient to have refrained from killing his wife and daughter. He simply chose not to so refrain.

In my view, the problem with basing conclusions as to the proffered mitigating circumstance on the psychiatric testimony is that the testimony was not directed at the effect of alcohol and drugs but at mental illness. The defendant had pleaded insanity as a defense to the killings. The three psychiatrists and one psychologist testified at the jury trial only and not at the sentencing hearing. Under Arizona law, voluntary intoxication is no defense to a homicide. *State v. Neal,* 143 Ariz. 93, 98, 692 P.2d 272, 277 (1984). Therefore, the effect of substance abuse on the day of the killings was not something defense counsel would be inclined to develop. In fact the judge instructed the jury that:

In connection with this definition of insanity, let me interject here that a defendant cannot be found legally insane when, because of his voluntary use of alcohol and/or drugs, he has a temporary episode of mental incapacity so as to be unable to know right from wrong or to not know the nature and quality of his acts. Moreover, a person cannot be found legally insane when he experiences a temporary episode of mental incapacity so as to be unable to know right from wrong or not know the nature and quality of his acts when this episode is caused by a combination of the voluntary use of

alcohol and/or drugs and a preexisting mental condition.

A.R.S. § 13–703(G)(1), in fact, is specific that mitigating circumstances may be found in an episode of mental incapacity inadequate to rise to a legal defense.

Four experts were called as witnesses during the trial. The defense called two psychiatrists. Dr. Bindelglass testified that the defendant committed the homicides while having a psychotic dissociative reaction. He testified that the defendant's ability to fully appreciate what was going on and to control his behavior were markedly impaired. He also observed the defendant as having schizophrenic symptoms with paranoid delusions and hallucinations. He described the schizophrenic symptoms as consistent with chronic drug abuse. He testified the defendant had a long history of alcohol and drug abuse and that such long-standing abuse produces "a certain degree of dysfunction."

Dr. Garcia–Bunuel, the other psychiatrist, testified that Stanley had been an abuser of alcohol and other drugs, and at the time of the offenses was under the influence of alcohol, marijuana, and cocaine. His testimony was that Stanley did not meet the test of legal insanity under *M'Naghten.*[1] He testified he believed there was a possibility that Stanley acted while having a dissociative reaction, but that it was unlikely.

The first of the two experts called by the State was Dr. Stewart, a psychologist. The prosecutor asked Dr. Stewart whether he had an opinion as to whether the defendant, on the date of the crimes, was suffering from a mental disease or defect. Dr. Stewart answered: "It was my opinion that he was, and that the nature of that disease or defect would be probably a multiple drug dependency, including alcohol and other various drugs that he had been taking for an extended period of time." The prosecutor then asked Dr. Stewart his opinions as to whether the defendant under-

---

1. The *M'Naghten* test for criminal insanity is whether the defendant understood the nature and quality of his actions and whether he understood that what he was doing was wrong.

*State v. Cano,* 103 Ariz. 37, 41, 436 P.2d 586, 590 (1968); *M'Naghten's Case,* 10 Clark & Fin. 200, 8 Eng. Reprint 718 (1843).

stood the nature and quality of his actions and whether he understood his actions were wrong per *M'Naghten.* He answered in the affirmative, although he added that Stanley's understanding would have been clearer had he not been under the influence.

The second expert called by the State, Dr. Gerstenberger, a psychiatrist, stated that in his opinion the defendant understood the nature and quality of his actions and that he was capable of understanding his actions were wrong. Dr. Gerstenberger was never asked for any opinion regarding whether alcohol and drug use on the day in question, or before, impaired the defendant's capacity to conform his conduct to the law. Both Drs. Stewart and Gerstenberger testified that they did not believe the defendant was in a dissociative state at the time of the shootings.

Rather than support the finding that the defendant's capacity was not impaired, it appears that the expert testimony—where it was directed to substance abuse—does the opposite. The fact that it justifies the jury's rejection of an insanity defense is an entirely separate, and even competing, question.

In *Rossi II,* this court had before it a defendant who had said earlier on the day of the crime that he planned to go to the victim's house under the pretext of selling a typewriter and kill anyone who got in his way. Rossi did go to the victim's house, did work a pretended sale, and then followed the victim into his bedroom. Rossi hit the victim with a blackjack and then shot him twice in the chest. The victim then pleaded with Rossi, "You have my money, you shot me, what more do you want?" Rossi then leveled his gun at the victim and fired a shot into his mouth.

Rossi's crime gave evidence of a cold, deliberate design—absent the drug issue. Stanley's crimes by contrast appear to be without lengthy prior thought, acting initially out of marital feud and passion.

There are parallels between the mitigation evidence in the two cases. The majority opinion here points out Stanley's appearance to a store clerk the night of the two

shootings and his actions to conceal the crimes. In *Rossi II,* two witnesses—one Rossi's neighbor and one Rossi's girlfriend—testified Rossi did not appear under the influence before or after the crimes. There was testimony that Rossi acted rationally just after the crime. He related in detail to the neighbor what happened. He did things to cover up his crime, like removing a license plate and fingerprints.

The evidence in favor of mitigation for Rossi came from three mental health doctors—and Rossi's known cocaine habit. Evidence in favor of mitigation for Stanley comes from the mental health experts, from his long term abuse of drugs, and from statements made. When Stanley confessed the killings to the police, he stated he was "drunk out of my gourd." At the sentencing hearing, the defendant's father testified that a local policeman said the defendant was "stoned out of his mind" on the night of the shootings. Reverend Jones testified at the sentencing hearing as to the quantities of alcohol and cocaine Stanley had used.

In *Rossi II,* this court, after reviewing the evidence for each side, concluded, "Neither appellant's evidence nor the State's evidence is above reproach." 154 Ariz. at 251, 741 P.2d at 1229. I would apply the same to the instant case. But the primary error, in my view, is attempting to apply the experts' opinions on the insanity issue to the question of mitigation. They involve different factual questions. Moreover, they verified Stanley's long-standing substance abuse and his being under the influence on the night of his crimes.

In making his findings, the trial judge also stated,

> [I]n the presentence report, Reverend Jones relates the defendant told him that over a six-hour period defendant consumed only four to six wine coolers and eight to ten lines of cocaine. This is simply not enough of either substance, combined or separate, to impair a person over a six hour period sufficiently to meet the requirements of subsection (G)(1).

There was no expert testimony as to such a conclusion. In addition, what Reverend Jones testified to at the pre-sentence hearing was that within six hours of the shootings, defendant, according to him, drank four *six-packs* of wine coolers and sniffed eight to ten lines of cocaine.

The surrounding facts of these homicides show that it is unlikely the defendant formed the intent to kill at the time his wife and children entered the car. It is more likely that the defendant, who had an ongoing argument with his wife, formed the intent to kill suddenly, upon being told that she would leave him. Given this factual background, the influence of alcohol and cocaine use prior to the shootings is not an insignificant matter. I believe it is essential in making the fact-finding determination regarding substance impairment that the findings be based on the existing testimony given particularly as to this issue. The record in this case shows that alcohol and drug abuse on the day in question did impair Stanley's ability to conform his conduct to the law. In light of the trial judge's finding that five other mitigating circumstances existed, and that three aggravating circumstances existed, the refusal of the trial judge to weigh this additional circumstance cannot be considered harmless.

While neither alcohol intoxication nor cocaine intoxication is in any sense a defense to the defendant's actions, and while this case may illustrate the necessity of society to defend itself from the effects of alcohol and drug abuse, the consideration of alcohol and cocaine use does bear on the issue of whether the defendant should receive the death penalty. I would remand this matter to the trial judge with instructions to resentence the defendant, taking into account the testimony of the effects of the defendant's substance abuse on his ability to control his impulses and actions on the day of the murders.