THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESSIE BELL, Defendant-Appellant.

Second District   No. 2—90—0187

Opinion filed April 6, 1992.—Rehearing denied May 27, 1992.

G. Joseph Weller and David Devinger, both of State Appellate Defender's Office, of Elgin, Kathleen T. Zellner, of Kathleen T. Zellner & Associates, of Naperville, and James P. Palermini, of Huck, Bouma, Martin & Charlton, of Glen Ellyn (Daniel F. DeLay, of counsel), for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

A jury found the defendant, Jessie Bell, guilty of felony murder, and he was sentenced to 20 years' imprisonment. The defendant raises two issues on appeal. First, the defendant argues the trial court erred in failing to quash his arrest and suppress his confession. Second, the defendant argues his conviction of felony murder cannot be sustained because the State failed to prove him guilty beyond a reasonable doubt of the predicate offense of robbery. We affirm.

The defendant was charged by indictment with two counts of murder. Count I charged the defendant with the offense of first degree murder in violation of section 9—1(a)(2) of the Criminal Code of 1961. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2).) Count II charged the defendant with the offense of first degree murder while attempting to commit a forcible felony, robbery, in violation of section 9—1(a)(3) of the Criminal Code of 1961. (Ill. Rev. Stat. 1989, ch. 38, par.

9—1(a)(3).) Prior to trial, the defendant moved to have his arrest quashed and certain statements he made suppressed. The trial court held a suppression hearing which revealed the following.

Officer Lou Tessman testified that he was involved in the investigation of the shooting death of victim Greg Vlahos, which occurred on July 6, 1989. Officer Tessman had been advised that Mr. Andre Kukendahl was in the vicinity of the incident when it occurred. Upon speaking to Mr. Kukendahl, Officer Tessman was informed that Mr. Kukendahl knew of two individuals in the area when the incident occurred, one of them being the defendant. In response to this information, Officer Tessman and Detective Taylor went to the defendant's home and asked that he come to the police station for questioning on July 7, 1989. Officer Tessman stated the defendant was not handcuffed, neither officer's gun was drawn, and the defendant was not under arrest at that time. After bringing the defendant to the Waukegan police station, they engaged in a conversation concerning the incident. The defendant denied involvement in the shooting death of the victim. Both Officer Tessman and Detective Taylor took notes during the interview. After the interview, the notes were transcribed into a typed statement. The statement, in narrative form, was not signed by the defendant.

Officer Tessman did not see the defendant again until July 13, 1989, at approximately 4:30 p.m. Officer Tessman and Detective Meadie went to the defendant's residence and again asked him to come to the police station for questioning. The officers did not have an arrest warrant. Officer Tessman testified that no handcuffs were used, the officers never drew their guns, and no force was used to subdue the defendant. The defendant was not told he was under arrest. Nor was he told whether he was free to leave. The defendant accompanied the officers to the Waukegan police department.

The officers took the defendant to the detective bureau, which is located in the basement of the police station. To gain entrance to the detective bureau, Officer Tessman had to unlock a locked door which closed behind the defendant and became locked again. The defendant was then placed in an interview room measuring approximately 10 feet by 10 feet with a desk and two comfortable chairs. The only window in the room was approximately 6½ feet from the floor, and the window led into a window well. Officer Tessman testified that Detective Meadie read the defendant his *Miranda* warnings from a preprinted form that is used by the police department. After the defendant agreed to speak to the officers, he signed the corresponding form, and the interview began.

The questioning lasted approximately three hours. Officer Tessman left the room approximately four to five times. He always closed the door behind him, but he testified that it was not locked. The defendant was offered coffee, food and an opportunity to use the bathroom. According to Officer Tessman, the defendant never asked if he could leave. Detective Pratt also joined the questioning, but he was never alone with the defendant. The defendant was not formally arrested until after his statement was obtained.

Detective Meadie also testified at the suppression hearing. He testified that, on July 13, 1989, he received a telephone call from Sergeant Crum informing him that Andre Kukendahl had implicated Jessie Bell and Robert Wright in the shooting. Kukendahl had stated that he had observed both the defendant and Robert Wright at the scene, he heard a gunshot and saw both individuals run from the area.

At that point, Detective Meadie accompanied Officer Tessman to the defendant's residence. They were driving an unmarked squad car. They waited outside for the defendant while he went back into the house to get something. The defendant accompanied the two officers to the police station. Meadie read the defendant his rights. He indicated with a check mark that the defendant acknowledged that he understood each right as it was read to him. He then gave the defendant the form and asked him to read it. The defendant read it, agreed to talk to the officers and signed the rights waiver form. Meadie was not in the interview room during the entire interview with the defendant. He was going back and forth between the defendant's interview room and Robert Wright's interview room. Meadie testified that he never heard the defendant ask for an attorney or ask to make a phone call. Meadie also testified that the only reason the defendant was picked up and brought to the station for questioning was on the basis of the statement made by Andre Kukendahl.

Detective Michael Taylor also testified at the hearing. He testified that, on July 13, 1989, at approximately 3 p.m., he had occasion to interview Andre Kukendahl. Mr. Kukendahl had been interviewed two previous times. The first time he identified himself falsely as "Jeff Parker." He told the police he had not seen the shooting. During his second interview, he told the police about the two individuals running from the scene and apologized for previously giving a false name and false statements to the police. During his third interview, Mr. Kukendahl was escorted to John Reed & Associates to take a polygraph examination. Mr. Kukendahl was asked whether he shot the victim and whether he knew who shot the victim. The examination indicated that not all of Mr. Kukendahl's statements were truthful. When Mr. Ku-

kendahl was confronted with the fact some of his answers appeared untruthful, he gave a statement to the police.

Mr. Kukendahl told Detective Taylor that on July 6, 1989, he was driving down the street when he had car trouble. He pulled his car over into the parking lot of Merlock's Service Station. He got out of the car to see what was wrong with it. As he was doing so, he heard a loud popping sound. At first he thought the sound was the backfire from a car. He stated that he heard voices saying "Give me your wallet." He heard a different voice say "I'm not going to give you my wallet." Then another voice said "What are you giving us a hard time for? We just want your wallet." He then walked to the curb and observed two black male subjects and a third white male subject with a duffel bag. He observed the subjects talking back and forth. He stated that he then saw the defendant grab the white male subject from behind and hold him. The white subject struggled, and then Kukendahl saw Robert Wright pull a handgun from his waistband and fire it. He saw the victim's head jerk back and then the victim fell to the ground. He then saw Robert Wright run from the scene down the alley behind the service station where his car had broken down. He did not see which way the defendant ran.

Mr. Kukendahl further stated to Detective Taylor that, after he saw Mr. Wright, he walked to his girlfriend's house and asked her for a gas can. The two of them began walking back toward the car. Before they reached his car, they saw Robert Wright and the defendant walking back toward the service station down the same alley. They stopped and had a brief conversation. They then saw police lights in the vicinity of the incident and walked over to see what was going on. They observed the victim lying on the ground in a pool of blood. The police told them to leave the area.

Officer Howard Pratt testified that he became involved in the interview of the defendant at approximately 8 p.m. on July 13, 1989. He and Officer Tessman were interviewing the defendant regarding the victim's murder. Officer Pratt testified that at no time did he threaten the defendant or promise the defendant anything in exchange for his statement. He testified that he and Officer Tessman questioned the defendant regarding the statement of Andre Kukendahl. At that time the defendant confessed. Officer Pratt typed up the statement, and the defendant read it and signed it.

On this information, the court found that the State had met its burden of establishing a *prima facie* case as to the voluntariness of the statements. The defense then called the defendant to the stand.

The defendant testified that he was 17 years old. He stated that, on July 13, 1989, at approximately 4 p.m., he was at home, in his room, combing his hair when he heard a knock at the door. He went to the front door and saw two men standing there who identified themselves as police officers. He recognized one of them from the July 7 interview. They asked him if he would go to the police station so they could ask him a couple of questions. He stated that, at that time, he did not feel he had any choice as to whether he could refuse to go. He went back to his room to get some money and heard one of the officers say "Go look on the side of the house, see if he ran out the back door." When he came back to the front door, one of the officers was standing back looking toward the back of the house. As the officers escorted the defendant to their car, he testified that one of them walked in front of him and the other walked behind him.

He further testified that, once he was at the police station and in the interview room, he tried to open the door to the interview room, but it was locked. He stated that, when Officer Tessman and Detective Meadie came in, Meadie read him his rights, and he signed the form. He stated that he understood "some of it." No one told him he was free to leave, and, when he requested to go to the washroom, one of the officers accompanied him and waited outside the door leading into the restroom. He also testified that, when he was interviewed on a previous occasion, he was not read his rights.

After hearing the evidence, the court denied the defendant's motion to quash the defendant's arrest and suppress his statements, finding the statements were voluntary and admissible.

At trial, Officer Slusser testified that he was the first officer on the scene after the shooting. He arrived at 11:10 p.m. A crowd of 20 to 25 people were standing around the body. After the medics removed the victim's body, Officer Slusser located a spent cartridge on the sidewalk where the victim's body had been. The parties stipulated to the fact that this was a nine millimeter caliber Luger-type cartridge. He then went to the hospital where the victim's body was taken. There, the paramedics gave him the victim's driver's license, which was found in the victim's wallet located in the victim's pocket.

A witness who arrived at the scene moments after the shooting testified that, after the crowd began to gather around the victim, he noticed the defendant standing on his left and Robert Wright standing on his right. Robert Wright asked him what had happened.

Detective Meadie and Officers Tessman and Pratt also testified at trial. Their testimony did not vary from their testimony at the suppression hearing except that no mention was made of the statements

made by eyewitness Andre Kukendahl. Officer Tessman read the defendant's confession into evidence. It read in pertinent part as follows:

"Me and my cousin, Robert Wright were walking *** down an alley. We then saw this white dude walking north down the sidewalk *** so we came up out of the alley *** and up behind this guy. I could see he was kinda [sic] short and that he was carrying a blue shoulder bag. I grabbed him from behind around his waist and Robert cut around the front of this guy. As I was holding him we were yelling 'Give us your wallet!' The guy resisted and was able to break free from me and then I saw Robert pull up his shirt and pull out a gun. I then saw the guy grab Robert's hand and the gun went off and I also saw the guy fall to the ground. Me and Robert then ran between two buildings ***."

After the jury trial, the defendant was acquitted on count I of the indictment, but found guilty on count II. The trial court denied the defendant's motion for a new trial, and defendant timely appeals.

First, we will determine whether the trial court erred in denying the defendant's motion to quash his arrest and suppress statements. The defendant contends that his confession was the fruit of an illegal arrest and, therefore, should have been suppressed by the trial court. The defendant argues that he was seized within the meaning of the fourth amendment when he accompanied Detective Meadie and Officer Tessman to the Waukegan police station for questioning regarding his involvement in the murder of Greg Vlahos.

A trial court's ruling on a motion to quash arrest and suppress evidence will not be reversed unless it is manifestly erroneous. (*People v. Collins* (1989), 182 Ill. App. 3d 362, 364; *People v. Stoica* (1987), 163 Ill. App. 3d 660, 668.) An arrest is a seizure, and a seizure occurs within the meaning of the fourth amendment only when a reasonable person, innocent of any crime and in view of all the circumstances surrounding the incident, would believe that he was under arrest or not free to leave. (*People v. Longoria* (1983), 117 Ill. App. 3d 241, 248-49, citing *United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877.) In the absence of a threatening presence of officers, a display of a weapon, a physical touching, or a use of language or a tone of voice which indicates compliance with the officer's request might be compelled, a seizure has not taken place. *People v. Collins*, 182 Ill. App. 3d at 365; *People v. Sanders* (1981), 103 Ill. App. 3d 700, 709.

The mere fact that the questioning took place in a police station is not, in and of itself, sufficient to convert the questioning into an arrest. (*People v. Matthews* (1990), 205 Ill. App. 3d 371, 402.) In determining whether an arrest has been made, courts focus on the intent of the police officers and the understanding of the individual being questioned at the time that individual was detained. (*People v. Wipfler* (1977), 68 Ill. 2d 158.) In assessing an officer's intent, the court will consider whether there was any formal declaration of arrest and whether other routine procedures associated with arrest were present, such as searching, booking, handcuffing, fingerprinting and photographing. (*People v. Johnson* (1989), 187 Ill. App. 3d 756, 769.) However, when examining the understanding of the individual being questioned, the court does not look to what that particular individual understood. Rather, as we have stated, the test is what a reasonable person, innocent of any crime, would have thought under similar circumstances. *People v. Longoria* (1983), 117 Ill. App. 3d 241, 248-49, citing *United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877.

■ In the case at bar, the defendant voluntarily accompanied the police to the police station. The officers allowed the defendant to go back into his house to retrieve something before he accompanied them to the police station. Once at the police station, the defendant was placed in an interview room. The defendant claims the door to the interview room was locked. The police officers testified that the door remained unlocked the entire time the defendant was in the room. It is for the trier of fact to determine the credibility of the witnesses and resolve conflicts in their testimony. (*People v. Matthews*, 205 Ill. App. 3d at 404.) Here, the trial court found the police officers more credible.

In addition, the defendant was not handcuffed at any time. There was no display of weapons or contact of any kind. The record does not indicate that the language used by the officers or their tone was suggestive of an arrest. The defendant was not told at any time that he was not free to leave. In fact, he had been interviewed on a prior occasion and was allowed to leave after questioning.

Once in the interview room, the defendant was read his *Miranda* warnings. The interview lasted approximately three hours. The defendant was given food and drink and was allowed to use the restroom. No traditional indicia of arrest were present. The defendant was not searched, fingerprinted or photographed. Although an officer accompanied the defendant to the restroom, he waited for the defendant outside the door. We do not find this unusual since the defendant

was in the basement of the police department, a place that is generally off limits to the public at large.

The defendant alleges that he was threatened while he was being questioned. The officers stated that they did not threaten the defendant. Again, the trier of fact is to determine the credibility of the witnesses, and, in this case, the trial court found the testimony of the police officers more credible. Therefore, we conclude the determination by the trial court that the defendant was not under arrest until after he made the statement confessing to murder was not manifestly erroneous.

Defendant also argues on appeal that his conviction of felony murder cannot be sustained because he was not proved guilty of the predicate offense—armed robbery—beyond a reasonable doubt. The defendant argues the evidence was insufficient to support the underlying felony of attempted armed robbery because the State failed to prove the *corpus delicti* of that offense.

It is necessary to prove the *corpus delicti* of an offense in order to prove a defendant guilty of that offense beyond a reasonable doubt. (*People v. Neal* (1985), 111 Ill. 2d 180, 194.) Failure to prove the underlying offense beyond a reasonable doubt results in the reversal of a conviction of felony murder. *People v. Hepler* (1985), 132 Ill. App. 3d 705, 713.

Our supreme court has held that proof of the *corpus delicti* or body of the offense requires both proof of injury or loss as well as proof of criminal agency. (*People v. Dalton* (1982), 91 Ill. 2d 22, 29; *People v. Lambert* (1984), 104 Ill. 2d 375, 378.) However, the court has also held that the *corpus delicti* cannot be proved by the defendant's confession alone. (*People v. Willingham* (1982), 89 Ill. 2d 352, 360; *People v. Lambert*, 104 Ill. 2d at 378.) There must either be some independent evidence or corroborating evidence outside the confession which tends to establish that a crime occurred. (*People v. Willingham*, 89 Ill. 2d at 360.) If there is such evidence and that evidence tends to prove the offense occurred, then that evidence, if it corroborates the facts contained in the defendant's confession, may be considered along with the confession to establish the *corpus delicti*. (*People v. Willingham*, 89 Ill. 2d at 361.) The requirement of proof apart from a defendant's own statements reflects a long-standing mistrust of extrajudicial confessions. *People v. Furby* (1990), 138 Ill. 2d 434, 447.

The corroboration requirement stems from an attempt to assure the truthfulness of the confession and recognizes that the reliability of a confession " 'may be suspect if it is extracted from one who is under the pressure of a police investigation—whose words may reflect

the strain and confusion attending his predicament rather than a clear reflection of his past.' " *People v. Willingham*, 89 Ill. 2d at 359, quoting *Smith v. United States* (1954), 348 U.S. 147, 153, 99 L. Ed. 192, 199, 75 S. Ct. 194, 197.

The determination whether there is sufficient independent proof of the *corpus delicti* will be judged by the particular circumstances of the case. (*People v. Furby*, 138 Ill. 2d at 450.) The rule of *corpus delicti* only requires that the evidence apart from the defendant's confession tends to show that a crime was committed; the independent evidence need not establish the crime beyond a reasonable doubt. *People v. Furby*, 138 Ill. 2d at 450.

■ In addition to the defendant's confession, the court heard the testimony of Dennis Ulmer and Coy Dabbs. Dennis Ulmer testified that he was driving down the street upon which Greg Vlahos was shot at approximately 10:58 p.m. He stated that he heard a shot and he saw a man fall to the ground. The man was carrying a blue bag. He stated that he did not see anyone near the body.

Coy Dabbs testified that he was one of the first people on the scene after the shooting. The police instructed him to wait near the body. He stated that a crowd began to form and several members of the crowd approached him. Mr. Dabbs identified Jessie Bell and Robert Wright as two of the individuals in the crowd who approached him. He testified that Robert Wright was standing to his left and that he asked Mr. Dabbs what had happened. He testified that the defendant was standing to his right but did not speak. This testimony is consistent with the portion of the defendant's confession stating that he returned to the scene of the shooting where he again met up with Robert Wright.

In his confession, the defendant stated that the victim had been carrying a blue bag. A blue bag was found next to his body. In addition, the State produced photographs of the area where the crime occurred and where the defendant described his escape route. The photographs corroborated the defendant's statements.

We conclude the evidence, independent of the defendant's confession, sufficiently corroborated the confession as to the attempted armed robbery. Although the evidence apart from the confession does not establish an armed robbery, evidence that a man was shot to death on a city street at 11 p.m. and that the shooter or shooters fled *tends* to establish an attempted armed robbery. (See *People v. Montes* (1989), 192 Ill. App. 3d 874, 881.) As the court stated in *Montes*, "There are other possibilities, of course. There could have been a dispute between two persons, for example. But the rule does not require

that the independent evidence establish the crime beyond a reasonable doubt." *Montes*, 192 Ill. App. 3d at 881.

We emphasize—the rule was designed to insure the reliability of the defendant's confession, not to establish the crime beyond a reasonable doubt. Accordingly, the independent evidence or corroborating evidence need only *tend* to establish that a crime occurred. (*People v. Howard* (1991), 147 Ill. 2d 103, 128; *Willingham*, 89 Ill. 2d at 360.) That requirement has been met in this case.

The evidence introduced at trial sufficiently corroborated the facts contained in the defendant's confession, and that evidence considered together with the confession established the *corpus delicti* of the offense of attempted armed robbery.

Accordingly, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and NICKELS, JJ., concur.