THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. QUENTIN D. HOLMES, a/k/a Quentin Fitzgerald, Defendant-Appellee.

Fifth District   No. 5—92—0374

Opinion filed January 4, 1994.—Rehearing denied January 28, 1994.

Rod Wolf, State's Attorney, of Harrisburg (Norbert J. Goetten, Stephen E. Norris, and Kendra S. Mitchell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE RARICK delivered the opinion of the court:

Defendant Quentin Holmes was charged with three counts of first-degree murder, one count of unlawful possession of a weapon by a felon, and theft over $300. (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(1), 9—1(a)(2), 24—1.1(a), 16—1(a)(1)(A).) The trial court entered a pretrial order, pursuant to defendant's motion, quashing defendant's arrest and suppressing his confession and physical evidence obtained as a result of the confession. The State appeals the suppression order. We reverse.

Testimony at the hearing on defendant's motion to suppress revealed that on the morning of November 25, 1991, the police were called to the Carrier Mills residence of Earl Wayne Gulley, where Mr. Gulley was found dead as a result of a gunshot wound to the chest. Saline County Deputy Jim Dunn suggested that Sheriff Henley talk to defendant because his name had come up during an investigation of an earlier burglary at Gulley's home. Deputy Dunn was aware that defendant had been assisting the victim in the recovery of some guns which had been stolen during the burglary. Sheriff Henley, Saline County Detective James Wheatcroft, and Deputy Mike Jones located defendant at the Carrier Mills home of his girlfriend, Lisa Violette. Defendant and his girlfriend were asked to come to the sheriff's department to be interviewed. They agreed, and defendant rode to the sheriff's department in Harrisburg with Sheriff Henley and Detective Wheatcroft. Deputy Jones waited for Lisa Violette, who needed to get dressed first. According to Detective Wheatcroft, defendant was not under arrest. On the way to the sheriff's department, defendant told Sheriff Henley that he could help solve "this thing *** probably give you the shooter." Because Sheriff Henley was not conducting the investigation, he told defendant that he would rather defendant wait and talk to the officers who knew more about the case.

Defendant arrived at the sheriff's department at about 10:10 a.m. Detective Wheatcroft left defendant in the "attorney's room" at the sheriff's department and told one of the jail staff that defendant would be there until they got back from the crime scene. To leave the department, a person would have to push a button which would then ring a bell alerting the dispatch officers to open the door. Defendant stated he was aware of the security door and knew how to get out of the building but never tried to leave. Wheatcroft did not tell the jail staff whether defendant could leave. As defendant was not considered a suspect at that time, he was not handcuffed or confined to the attorney's room. He was told he could go to the kitchen where coffee

was available, was allowed to wait in the same room with his girl-friend, and had free access to the restroom.

Sheriff Henley never told defendant he was free to leave, nor did he tell the person who operated the security door that defendant could leave. Henley acknowledged that the sheriff's department log notation, "watch two suspects for Major Miller and Sheriff Henley," probably referred to defendant and his girlfriend. Major Miller did not recall telling the dispatch officer to watch defendant, but if he had, he stated he would not have used the term "suspects" because defendant and Violette were not suspects. One reason he would have wanted defendant watched was because his office contained antique guns and ammunition. Jail administrator David Underwood, who was not on duty and not involved in the investigation, was painting his office near where defendant was waiting to be interviewed. At one point Underwood overheard defendant telling a person that he did not want anyone to know he was there because he was helping the police on a murder case.

After Detective Wheatcroft returned to the department about 11:15 a.m., he and Illinois State Police Department of Criminal Investigations (DCI) Agent David Elwood interviewed Lisa Violette. The purpose of the interview was to gain information about defendant's helping the victim in recovering the weapons which were stolen on November 18. Violette told the officers the victim had given a gun inventory list to defendant the previous week. She also stated defendant suspected Jerry Gulley committed the burglary. According to Wheatcroft, neither Violette nor defendant was a suspect in the burglary at that time. At approximately noon or 1 p.m., after Violette's interview, sandwiches were brought in for Violette, defendant, and the investigating officers who were at the department. Although nothing was said during Violette's interview which made the officers feel defendant was a suspect, the officers did decide to seek search warrants for both defendant's residence and Violette's residence in case the items Violette had talked about might lead to evidence concerning the murder.

At about 2:30 p.m., while waiting for the search warrants, Detective Wheatcroft conducted a preliminary interview with defendant. Wheatcroft learned defendant had been at the victim's home the night before, talking about the one gun that still had not been recovered. Defendant stated Jerry Gulley arrived while he was there. Defendant decided to go out the back door because he did not want Jerry to know he (defendant) had told Earl Wayne Gulley that Jerry might have been the one who took his guns. The interview lasted approxi-

mately 45 minutes. Nothing said during the interview made Wheat-croft believe that defendant was a suspect. In fact, at that time, Wheatcroft believed defendant to be the main witness against Jerry Gulley. Defendant had not asked to leave the department and had agreed to give a tape-recorded statement. During the time that Wheatcroft was "waiting around for a search warrant," he "talked off and on with [defendant] two or three times." Around 3:30 p.m. Chief Deputy Ed Miller went in to talk with defendant and ask him whether he had been at the victim's home when the murder occurred. Defendant became agitated with Miller and told him to either arrest him or let him go. Miller did not give *Miranda* warnings to defendant before talking with him. Wheatcroft then went back in the room with defendant and told defendant to calm down. Defendant did not ask Wheatcroft if he could leave.

The search warrants were issued at approximately 6:30 p.m. Defendant accompanied Illinois State Police Officer David McLearin and Detective Wheatcroft in Wheatcroft's car to his home. Wheat-croft's car did not have a cage, nor were there any automatic locks on the back doors. Defendant was not restrained in any way. The officers did not inform defendant he did not have to go with them, nor did they tell him he did not have to return to the department. Defend-ant's home was searched from 7:05 to 7:23 p.m. After the search, defendant rode with the officers to Lisa Violette's house. Defendant still was not considered to be a suspect and was not restrained in any way. At that time, the focus of the investigation was still on Jerry Gulley. Wheatcroft testified that the search warrant included items of clothing only to eliminate defendant's involvement in the shooting. Of-ficer McLearin explained that as part of their investigation they needed to prove defendant was not present at the murder scene. The reason the search warrant included clothes was so they could check for blood spatters. If the clothing did not have blood spatters, it would bolster defendant's statement he was not there. McLearin ex-plained it was just like taking fingerprints—"you have a lot of people who might be in an area and sometimes you have to get elimination prints."

When the searches were completed, defendant was asked to re-turn to the sheriff's department in Harrisburg so that he could give his tape-recorded statement. The officers asked defendant if he would drive himself so they would not have to take him back to Carrier Mills after the interview. Defendant agreed, arriving back at the depart-ment around 8 p.m. No one was told to follow defendant to the sher-iff's department.

At approximately 8:20 p.m. in the attorney's room at the sheriff's department, McLearin and Wheatcroft took defendant's tape-recorded statement. As part of the standard preamble to all taped statements conducted by "DCI," *Miranda* rights were read to defendant. Defendant indicated he understood those rights. When asked if he ever had had any mental problems, defendant replied affirmatively. Because Officer McLearin did not notice defendant's reply, no further inquiry was made regarding defendant's mental capacity at that time. The interview ended about 9:04 p.m. and contained most of the same information given during the 2:30 p.m. interview. Defendant did add that the victim and Jerry Gulley argued and that he heard a gunshot while Jerry was in the victim's home. Wheatcroft did not remember whether defendant asked to leave at that time, but the officers did ask defendant to "wait around a little bit longer" until the officers had talked with Jerry Gulley in case they needed defendant to rebut anything.

Agent Elwood interviewed Jerry Gulley, Jerry's live-in girlfriend, and her two children at approximately 9:30 or 10 p.m. All stated Jerry was at home during the time defendant said he had seen Jerry at the victim's home. Some time thereafter, a Carrier Mills police officer confirmed that Jerry's truck had been at his home during the time the victim was killed.

Wheatcroft testified that at 11 p.m., Chief Deputy Miller advised them Jerry had an alibi for the time of the shooting. The officers then believed defendant was not being truthful and decided to reinterview him. At this point, defendant became a suspect. At 11:27 p.m., again in the attorney's room at the sheriff's department, defendant was told the officers did not believe he was telling the whole truth. *Miranda* rights were read to defendant. He was also given a written form, which he signed. This interview was not tape recorded. The officers told defendant that Jerry could not have shot Gulley and that if defendant shot him in self-defense, they would pass on such information to the State's Attorney. Defendant informed them he had been at the victim's home. The victim accused him of committing the burglary and of trying to get more money by selling the guns back to him. Defendant stated he thought the victim was going to reach for a gun on the table, so defendant picked up a shotgun and fired at the victim. About 15 minutes into the interview, defendant told them that he wanted an attorney. Officer McLearin advised defendant it was his right to contact an attorney and the interview would have to be terminated because defendant had asked for an attorney. Within approximately 30 seconds of the termination of the interview, defendant said

that he would like to go ahead and talk to them. McLearin explained to defendant that the interview was terminated and that they could no longer talk to him because he had asked for an attorney. McLearin explained the only way they could talk would be for defendant to initiate the conversation and request to talk to them. Defendant then stated he wished to go ahead and tell his side of the story without an attorney. McLearin proceeded to ask defendant questions. *Miranda* rights were not given again. They talked about the murder for approximately another 15 minutes. Officer McLearin then asked defendant if he would give a taped statement repeating what he had just told them. Defendant agreed. McLearin suggested they take a break to allow defendant to regain his composure, as he had become upset when he talked about pulling the trigger. Defendant was given food and drink.

The second taped statement began at 12:18 a.m. with Officer McLearin again giving *Miranda* warnings to defendant. Defendant understood he did not have to talk to the officer or give a statement. During the standard preamble to the statement, defendant stated he had been treated for depression while he was in the Department of Corrections but no longer had any mental problems. As in the preceding untaped statement, defendant indicated that he had gone to Gulley's house, and that Gulley had accused defendant of having broken into his house and stolen his guns. As defendant got up to leave, he thought Gulley was reaching for a gun on the table. Defendant grabbed a shotgun off of a counter and shot Gulley. Defendant also revealed that he took a ring and two watches from the victim's home to give the appearance of a robbery, and that he also took the shotgun with which he had killed the victim and threw it in the Carrier Mills reservoir. The interview concluded about 12:39 a.m. at which time defendant was placed under arrest. Wheatcroft and McLearin asked defendant to take them to the Carrier Mills reservoir and show them where he had thrown the shotgun, and defendant agreed. Defendant was handcuffed for the trip. The shotgun was eventually recovered by divers in the area defendant had indicated. The victim's ring and watches were not found where defendant said he had discarded them but were later recovered by independent information.

Defendant testified he was taken to the sheriff's department by Detective Wheatcroft and Sheriff Henley at about 10 a.m. to talk about the shooting death of Earl Gulley. When defense counsel asked whether anybody told defendant he was free to leave, defendant replied, "no, sir." Defendant also replied negatively to defense counsel's inquiry whether defendant had the impression he was free to leave.

Defendant testified that he was not physically restrained, and that he drove himself back to the sheriff's department after the search of his residence. Defendant stated that when Detective Wheatcroft told him his story did not "check out," defendant told Wheatcroft to either arrest him or let him go. Wheatcroft then allegedly told defendant he was not going anywhere because his story did not check out. Defendant further testified that when he asked for an attorney during the 11:27 p.m. interview, he was told the interview was terminated. Defendant claimed he never told Wheatcroft and McLearin he would go ahead and talk with them after the interview had been terminated. Although no one told him how to get out of the building, defendant stated he knew how to do so. He also knew he could use the restroom at any time. Defendant admitted receiving *Miranda* warnings prior to giving his taped statements and that he knew what *Miranda* warnings were. He acknowledged that he understood he did not have to speak to the police and that he was entitled to an attorney if he wanted one. He also admitted the officers did not force him to speak after he asked about an attorney.

An information, filed on November 27, 1991, charged the defendant with three counts of first-degree murder, one count of unlawful possession of a weapon by a felon, and one count of theft over $300. On May 19, 1992, defendant filed motions to suppress his arrest, his confession, and the resulting evidence. Following testimony and arguments on these motions, the court granted defendant's motions on May 21, 1992. In so ruling, the court stated it looked "almost entirely at the testimony of the police officers" and found nothing unbelievable concerning the facts, time, or places, but the court found that because of defendant's previous experience with the police, defendant could have believed he was in custody. The court concluded the officers "collectively did take the defendant into custody for questioning without a warrant and without probable cause." The court also found defendant did not knowingly and intelligently waive his right to counsel. The State filed its notice of appeal and certificate of impairment on June 22, 1992.

The issue before this court is whether the trial court's suppression orders should be upheld. In reviewing a trial court's determination on a motion to suppress, we recognize that unless the trial court's decision is manifestly erroneous, we may not disturb it. (*People v. Melock* (1992), 149 Ill. 2d 423, 432, 599 N.E.2d 941, 944; *People v. Brown* (1990), 136 Ill. 2d 116, 125, 554 N.E.2d 216, 220; *People v. Collins* (1989), 182 Ill. App. 3d 362, 364, 538 N.E.2d 781, 783.) To resolve this

issue, we shall examine both the fourth and fifth amendment considerations raised by the facts.

The trial court suppressed statements made by defendant to law enforcement officers, as well as physical evidence obtained as a result of those statements, on the grounds they were elicited subsequent to an illegal seizure. The first matter we need to determine is whether defendant's fourth amendment rights were violated when he was brought to the Saline County sheriff's office to be interviewed. It is undisputed that prior to defendant's oral admission to Officer McLearin and Detective Wheatcroft during the 11:27 p.m. interview, there was no probable cause for defendant's arrest. Accordingly, if defendant was illegally detained prior to making that admission, the admission, the subsequent written confession, and the physical evidence obtained as a result of his statements may be tainted and thus properly suppressed. See *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.

The State initially argues the trial court erred in finding defendant was illegally seized in violation of the fourth amendment. In granting defendant's motion to quash his arrest and suppress the evidence derived therefrom, the trial court determined defendant was taken into custody (seized) at 10 a.m. on November 25, 1991, when he entered the sheriff's vehicle and was driven to the sheriff's office for an interview without a warrant and without probable cause, in violation of his fourth amendment rights.

We begin by examining the nature of defendant's detention. Individuals are protected from unreasonable searches and seizures by both the United States (U.S. Const., amend. IV) and the Illinois (Ill. Const. 1970, art. I, §6) Constitutions. For fourth amendment purposes a seizure is synonymous with an arrest, and absent probable cause or a warrant based thereon, an arrest is violative of the protections afforded by the fourth amendment. (*People v. Melock* (1992), 149 Ill. 2d 423, 436, 599 N.E.2d 941, 946.) A seizure occurs within the meaning of the fourth amendment only if, in view of all the circumstances surrounding the incident, a reasonable person, innocent of any crime, would believe he was under arrest or not free to leave. (*United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877; *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319; *People v. Longoria* (1983), 117 Ill. App. 3d 241, 249, 452 N.E.2d 1350, 1355.) It is important to note that the constitutional test for determining whether a seizure occurred is not how the particular subject subjectively perceived the situation, but what a reasonable person, innocent of any crime, would have thought, had he

been in the defendant's shoes. *People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870, 873.

In determining whether or not a certain situation constitutes an arrest or only consensual presence, the courts look to several factors. LaFave in his fourth amendment treatise, Search and Seizure, discusses some of the considerations courts are inclined to take into account, noting that consent is usually found if the police specifically advised a suspect that he was not under arrest or that he was free to leave if he wished, whereas cases coming down on the arrest side of the issue often note that such explanation was lacking. (2 W. LaFave, Search & Seizure §5.1(a), at 390-91 (2d ed. 1987) (Search & Seizure).) Similarly, the chances of a finding of consent are enhanced if the police put the matter to the suspect only in terms of a request, whereas the situation is otherwise if the suspect's presence is ordered. (Search & Seizure at 391.) LaFave notes that resort to physical restraint is almost certain to indicate an arrest while the lack of such restraint is a consideration pointing towards consent. (Search & Seizure at 391.) Circumstances contributing to the conclusion that a suspect's presence at a police facility was voluntary include the fact that he transported himself to the police facility as well as facts tending to show the suspect deliberately chose a stance of eager cooperation in an attempt to allay any suspicions of the police. (Search & Seizure at 391-92.) Circumstances which are coercive in nature, indicating lack of consent, include the threatening presence of several officers or subjecting the suspect to intensive interrogation. (Search & Seizure at 392.) Additionally, it is important to note that an otherwise valid consent is not undone by the fact, should the police later forthrightly admit, they would not have allowed the suspect to leave if he had tried. Search & Seizure at 392.

In a similar case, *People v. Bell* (1992), 233 Ill. App. 3d 40, 598 N.E.2d 256, the appellate court found the defendant, who voluntarily accompanied officers to the station for questioning, was not under arrest until after he made a statement confessing to murder, despite the defendant's contention he was placed in a locked interview room and threatened. The officers testified that the room was not locked, no threats were made, the defendant was never handcuffed, searched, fingerprinted, or photographed, there was no display of weapons or physical contact with the defendant, and the defendant was not told he was not free to leave. The defendant was questioned for three hours in the detective bureau's 10-foot by 10-foot interview room located in the basement of the police station. To gain entrance to the detective bureau, one had to get past a locked security door. During

the questioning, the officers testified that the defendant was offered food, coffee, and an opportunity to use the bathroom. Testimony also revealed the defendant never asked if he could leave.

■ Here, defendant and his girlfriend were asked to accompany officers to the sheriff's office for an interview because the officers knew defendant had been helping the murder victim recover property stolen in a recent burglary and thought defendant might know something or may have discovered something while helping the victim which would provide some clues to the identity of the murderer. The officers did not order defendant to come to the office to answer questions. Neither defendant nor his girlfriend was a suspect at the time they were requested to go to the sheriff's office. The officers did not draw their guns, nor did they handcuff or otherwise restrain defendant on the way to the sheriff's office. Once at the sheriff's office, defendant was not searched, handcuffed, photographed, or fingerprinted. He was allowed to move about, go to the kitchen for coffee, go to the restroom, and talk to his girlfriend. Although the sheriff's office is a secured area, defendant knew how to get out of the building and would not have been detained if he had asked to leave. As in *Bell*, where there is a complete absence of the threatening presence of officers, a display of weapons, a physical touching, or the use of language or a tone of voice which indicates compliance with the officer's request might be compelled, a seizure has not taken place. (See *Bell*, 233 Ill. App. 3d at 46-48, 598 N.E.2d at 261.) Furthermore, the mere fact that questioning took place in the sheriff's office is not, in and of itself, sufficient to convert such questioning into an arrest. *Bell*, 233 Ill. App. 3d at 47, 598 N.E.2d at 261; *People v. Matthews* (1990), 205 Ill. App. 3d 371, 402, 562 N.E.2d 1113, 1131.

Defendant seeks to distinguish *Bell* by claiming his statement to Deputy Miller to "arrest me or let me go" indicates he was indeed being held. We do not agree. As every citizen has a duty to assist police officers up to the point of self-incrimination, an assumption that one is required to cooperate with the police can hardly be equated with an arrest. (*Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 161; *People v. Wipfler* (1977), 68 Ill. 2d 158, 167, 368 N.E.2d 870, 873.) We find that an innocent man in defendant's shoes could have reasonably concluded that the sheriff's officers viewed him as an important witness, that they intended to enlist his cooperation, and that cooperation would be expected. See *Wipfler*, 68 Ill. 2d at 167, 368 N.E.2d at 873.

A case from another jurisdiction in which the statement "arrest me or let me go" was found to be of no significance is *State v. Burns*

(1984), 142 Ariz. 531, 691 P.2d 297 (*en banc*). Although the case dealt more with fifth amendment issues, we still find it relevant to the issue before us here. In *Burns,* the Arizona Supreme Court affirmed the defendant's conviction and sentence for murder, finding no error in the trial court's refusal to suppress statements made by the defendant after invoking his right to counsel. Apparently the defendant gave a statement at a sheriff's substation (office) claiming that he and the victim had been ambushed by unknown assailants and that the victim had been shot from a distance. He agreed to lead the sheriff to the victim's body. After finding the body, the defendant was requested to accompany the officers back to the sheriff's substation so that he could relate his story to a homicide investigator who was summoned from Phoenix, 64 miles away. A deputy sheriff testified at the suppression hearing that the defendant was neither handcuffed nor under arrest and that he was free to leave because there was "no indication he (the defendant) had done anything wrong at that time." (*Burns,* 142 Ariz. at 532, 691 P.2d at 298.) Defendant spent the night at the sheriff's substation, and when the Phoenix investigator arrived early the next morning, he repeated the ambush story. The defendant then "became agitated." Although he had not yet been read his *Miranda* rights and allegedly was not a suspect and was free to leave, defendant demanded an attorney and told the investigator to "charge me or let me go." (*Burns,* 142 Ariz. at 533, 691 P.2d at 299.) The investigator testified at the suppression hearing that although he would not have been pleased if the defendant had decided to leave the substation, he could not have prevented it because defendant was not yet a suspect. When the investigator was leaving to travel to the murder scene, the defendant agreed to accompany him. The investigator declined the offer and requested, but did not order, the defendant to remain at the substation. The defendant was left in a conference room at the substation unrestrained. After viewing the body, the investigator concluded that the victim suffered a close contact wound, and because this differed from the defendant's account, the investigator read defendant his *Miranda* rights upon returning to the substation. In rejecting the defendant's assertion that the trial court committed reversible error by failing to suppress all statements made after invoking his right to counsel and demanding that the investigator "charge [him] or let [him] go," the court stated:

> "At the outset, we note that the defendant was advised of his *Miranda* rights after Detective Dominquez returned from the murder scene. [Citation.] Prior to that time, *Miranda* warnings were not required because the defendant, although being ques-

tioned, was not in custody and was not a suspect. He was in a conference room at the Gila Bend Substation and was free to leave at any time. Under the totality of the circumstances, a reasonable man would not have felt deprived of his freedom. Accordingly, *Miranda* warnings were not required at this stage and solicitation of information was clearly permissible." (*Burns*, 142 Ariz. at 534, 691 P.2d at 300.)

Like *Burns*, at the time defendant here stated "arrest me or let me go," he was not in custody and was not a suspect. He was in an interview room at the Saline County sheriff's office and was free to leave at any time. Under the totality of the circumstances, a reasonable man would not have felt deprived of his freedom.

Defendant relies upon *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, to support his claim of illegal arrest. *Townes*, however, is distinguishable. In *Townes*, the defendant was subjected to almost continuous interrogation at the police station for a period in excess of 12 hours. During the interrogation, the defendant was consistently read his *Miranda* rights, which could indicate to a reasonable person he was in custody on suspicion of criminal activity. (*Townes*, 91 Ill. 2d at 37, 435 N.E.2d at 105.) After getting the defendant's consent, the police officers searched his home and car and confronted him with the fruits of that search. They requested that he submit to a medical examination and transported him to a local clinic where they obtained head and pubic hair samples and fingernail scrapings. Upon returning to the police station, the defendant was placed in a lineup, and although the victim was unable to identify the defendant as her assailant, the defendant was not released but rather questioned further for four hours. The *Townes* court described this police activity as an "expedition for evidence." *Townes*, 91 Ill. 2d at 37, 435 N.E.2d at 105.

In contrast, we do not find any "expedition of evidence" here. Defendant was not badgered with questions the entire time he was at the sheriff's department. In fact, for the most part, the officers were too busy to attend to defendant. Prior to the time he became a suspect, defendant had only been questioned twice: once at 2:30 p.m. for 45 minutes and again in the evening from 8:20 to 9:05 p.m. Unlike *Townes*, the officers did not interrogate defendant in the hope of obtaining sufficient information upon which to predicate the probable cause necessary for an arrest. Defendant was not considered a suspect until approximately 11 p.m. Prior to that time, defendant had been viewed as an important witness for the State against another suspect. Defendant had told the officers he could help solve "this thing" and probably "give [them] the shooter." Defendant also was

overheard telling some individual that he did not want anyone to know he was at the sheriff's office because he was helping the police on a murder case.

We also find *People v. Young* (1990), 206 Ill. App. 3d 789, 564 N.E.2d 1254, another case upon which defendant relies heavily, to be distinguishable. In *Young*, the defendant, after being driven by police to the station house at their request for "questioning," was placed in a small interview room where he initially was questioned. Although he did not implicate himself, the police left the defendant to spend the entire night (over 12 hours) in the small, closed, interview room, containing no washing or sleeping facilities and no telephone, without informing him he was free to go or inquiring whether he would prefer to go home to sleep in his own bed and then return to the station the next day if necessary. (*Young*, 206 Ill. App. 3d at 800, 564 N.E.2d at 1262.) Here defendant was allowed free access to the restroom, was told he could go to the kitchen where coffee was available, and was allowed to sit in the same room and talk with his girlfriend while they waited to be interviewed.

As noted earlier, the constitutional test for determining whether a seizure occurred is not how the particular subject subjectively perceived the situation, but what a reasonable person, innocent of any crime, would have thought, had they been in the defendant's shoes. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870, 873.) Unfortunately, in this instance, the trial court applied an improper subjective test. The trial judge, who regularly dealt with civil matters and candidly admitted he was unfamiliar with criminal law, viewed the question of seizure from the perspective of defendant rather than using the requisite objective, reasonable person, innocent-of-any-crime test. Noting that defendant had a prior record and had been in police stations before, the trial judge found defendant could have believed he was "in custody." Continuing, the court stated: "I believe what the police officers testified to. I'm simply looking at the situation from the defendant's standpoint." After reviewing the testimony in the record, coupled with the trial court's application of the wrong (subjective) test, we find the trial court's ruling on defendant's suppression motions (with respect to the fourth amendment) to be manifestly erroneous. We wish to point out that we are not substituting our judgment for that of the trial court on issues of credibility. We note the trial court, in ruling on defendant's suppression motions, stated in pertinent part:

> "I would also have to say that I believe the testimony of those police officers. I didn't find any real conflicts, didn't find any-

thing that I thought was in any way unbelievable concerning the facts, the times, the places, things of that character. I would really commend them, in fact, for their candidness in answering the questions honestly and truthfully."

With this in mind, and after considering the facts and circumstances, we cannot say that a reasonable, innocent man, in defendant's shoes, would have cause to believe himself arrested.

In summary, we find the trial court's finding that defendant was arrested (seized) when he was brought to the sheriff's office on the morning of November 25, 1991, to be manifestly erroneous. The actions of the Saline County officers were perfectly proper and involved no more than what was minimally necessary for them to successfully investigate a crime, as is their duty. (See *People v. Wipfler* (1977), 68 Ill. 2d 158, 168, 368 N.E.2d 870, 873.) They were aware that an individual (defendant) had been helping the murder victim recover weapons stolen in a recent burglary and properly inferred that this individual might have some information which could help them in their investigation. They asked defendant to come to the sheriff's office so they could learn what information he had. In fact, defendant, anxious to help the officers, told them he could probably solve "this thing" and "give [them] the shooter." As the supreme court noted in *Wipfler*:

> "To hold that this amounted to an arrest would be to hold that virtually any station-house interrogation is necessarily so custodial as to indicate that the person questioned has been placed under arrest. This would mean that the police could not request the presence of anyone, even for noncustodial questioning, unless and until they had probable cause to arrest the person to be questioned. We see no reason to so restrict the investigatory function of the police." (*Wipfler*, 68 Ill. 2d at 168, 368 N.E.2d at 873.)

We conclude that defendant's statements and the evidence derived therefrom were not taken in violation of defendant's fourth amendment rights.

Having determined defendant was not under arrest for fourth amendment purposes, we must next consider whether defendant, although not arrested, was nonetheless taken into custody or otherwise deprived of his freedom for *Miranda* purposes, since any incriminating statements obtained in violation of *Miranda* are inadmissible at trial. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) The test laid down in *Miranda* to determine if a suspect must be advised of his rights is whether the individual is in custody or

otherwise deprived of his freedom in any significant way. (See *People v. Wipfler* (1977), 68 Ill. 2d 158, 168, 368 N.E.2d 870, 874.) In determining whether a suspect is in custody, courts consider several factors, including: (1) the time, place, and length of interrogation; (2) the number of police officers present; (3) any statement or nonverbal conduct indicating an individual is not free to leave; (4) any indicia of a formal arrest procedure, such as physical restraint, display of weapons, use of force, booking, or fingerprinting; (5) the extent of the knowledge of the officers and focus of their investigation; (6) the intention of the police officers; (7) the presence or absence of family or friends; and (8) the manner in which the individual arrived at the place of interrogation. (See *People v. Melock* (1992), 149 Ill. 2d 423, 440, 599 N.E.2d 941, 948; *People v. Brown* (1990), 136 Ill. 2d 116, 124-25, 554 N.E.2d 216, 220.) In addition, the supreme court has grafted an objective test onto this traditional fifth amendment analysis of custody. The reasonable person, innocent-of-any-crime test used in fourth amendment cases (which we have previously discussed) has also been adopted for use in the determination of custody for fifth amendment purposes. (See *People v. Melock* (1992), 149 Ill. 2d 423, 440, 599 N.E.2d 941, 948; *People v. Brown* (1990), 136 Ill. 2d 116, 124-25, 554 N.E.2d 216, 220; *People v. Lucas* (1989), 132 Ill. 2d 399, 417-18, 548 N.E.2d 1003, 1009.) Accordingly, after weighing the traditional factors, as recited above, the court must then make an objective determination as to what a reasonable person, innocent of any crime, would perceive, if he were in the defendant's position. *Melock*, 149 Ill. 2d at 440, 599 N.E.2d at 948.

 Applying these traditional factors and the "reasonable person" test to the facts in the instant case, we conclude defendant was not in custody. Defendant was not compelled to come to the sheriff's office. A request was made, and he went voluntarily. The officers did not announce he was under arrest. There is no indication that defendant was induced to accompany the officers to the sheriff's office against his will. On the contrary, defendant was anxious to assist the officers. Regardless of defendant's subjective beliefs, he would not have been stopped if he wanted to leave the sheriff's office. In the 12 hours prior to the time he became a suspect, defendant was only questioned on two occasions for 45 minutes: once at 2:30 p.m. and again at 8:20 p.m. Defendant was not handcuffed at any time during the questioning and was otherwise unrestrained during the times he was being transported by the officers. As we have previously stated, any indicia of a formal arrest procedure was lacking in this case. There were no physical restraints, no show of weapons or force, and no

booking or fingerprinting. Defendant was allowed to move about and go to the kitchen and to the restroom, and he was allowed to talk to his girlfriend. Defendant was also given food and drink while waiting to be interviewed. Furthermore, in the early evening (6:30 or 7 p.m.), defendant was allowed, but not required, to accompany the officers during the execution of their search warrant. During this time defendant was not restrained in any way. Defendant thereafter was asked to drive himself back to the sheriff's office to give a taped statement because the officers anticipated he would be leaving after his statement and wanted to save themselves another trip to Carrier Mills.

Viewed objectively, defendant was not in custody or otherwise deprived of his freedom of action in any significant way, and accordingly, *Miranda* warnings were not required at the outset of the interrogation. Even though *Miranda* warnings were given prior to the 8:20 p.m. interview, as part of a standard preamble to all DCI questioning, this is not determinative of whether the interrogation was custodial. "A custodial situation cannot be created by the mere giving of *Miranda* warnings." *Wipfler*, 68 Ill. 2d at 171, 368 N.E.2d at 875.

Summarizing, we hold that defendant's detention did not amount to an arrest, and accordingly, there was no fourth amendment violation. Further, up until the time of his admission, defendant was not in custody. Since he was not in custody, *Miranda* warnings were not required, although they were given prior to the 8:20 p.m. interview. Accordingly, defendant's admission (during the 11:27 p.m. interview) and his subsequent confession and the physical evidence derived therefrom were not tainted by any fourth or fifth amendment *Miranda* warning violations and properly gave rise to probable cause for defendant's arrest. The trial court's findings to the contrary are manifestly erroneous.

Finding that defendant's admission and confession and physical evidence derived therefrom were not tainted by any fourth or fifth amendment *Miranda* warning violations does not end our inquiry. The trial court also suppressed defendant's admission during the 11:27 p.m. interview, his subsequent confession at the 12:18 a.m. interview, and the physical evidence gained as a result, because the court felt the State had not met its burden to show that defendant knowingly and intelligently waived his previously invoked right to counsel. Accordingly, the final issue we need to address is whether the trial court erred in finding that defendant's right to counsel was violated.

In determining whether defendant's fifth amendment right to counsel was violated in this case, we look to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and its prog-

eny, *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, and *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830. *Miranda* dictates that when an individual, subjected to a custodial interrogation, requests an attorney, all interrogation must cease until an attorney is present. (*Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1628.) In *Edwards v. Arizona*, the Supreme Court addressed the conditions under which an interrogation may be resumed, holding that a suspect "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1885.

In *Oregon v. Bradshaw*, the Supreme Court refined the holding of *Edwards* by defining a two-step approach that courts should take when considering whether a defendant has effectively waived his previously invoked right to have counsel present during a custodial interrogation. The first step is to inquire whether the defendant initiated further communication with the authorities that demonstrates a willingness to discuss the substance of the investigation or "a desire for a generalized discussion about the investigation." (*Bradshaw*, 462 U.S. at 1045-46, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) This is to be contrasted with inquiries such as a request for a drink of water or a request to use a telephone, "that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." (*Bradshaw*, 462 U.S. at 1045, 77 L. Ed. 2d at 412, 103 S. Ct. at 2835.) The second step is to determine whether, by the defendant's initiation of a conversation, coupled with the totality of the circumstances, the defendant knowingly and intelligently waived his previously invoked right to counsel's presence during questioning. *Bradshaw*, 462 U.S. at 1044-45, 77 L. Ed. 2d at 412, 103 S. Ct. at 2834.

Applying this approach to the facts here, we conclude that: (1) defendant initiated further communication with the officers demonstrating a willingness to discuss the substance of the investigation, and (2) despite the trial court's finding to the contrary, under the totality of the circumstances in this case, defendant's waiver of his previously invoked right to counsel was knowing and voluntary.

In ruling the State had not shown that defendant knowingly and intelligently waived his right to counsel once such right had been invoked, the trial court stated there was no testimony about a

question-and-answer sequence to show precisely what was said by the officers and defendant; the only evidence was the conclusions of the two officers that defendant freely and intelligently waived his right to have counsel present. We find this to be manifestly erroneous. To the contrary, from our reading of the record, we find the testimony at the suppression hearing revealed that defendant knowingly and voluntarily waived his right to counsel after he invoked it.

At 11:27 p.m., Officer McLearin told defendant they would like to talk to him about the fact they did not believe he had been truthful with them in his previous interviews. Officer McLearin verbally gave the *Miranda* warnings to defendant. Defendant also signed the written waiver form. This interview lasted approximately 20 minutes, during which defendant admitted he had shot the victim because he thought the victim was going to reach for a gun. About 15 minutes into the interview, defendant stated he wanted an attorney. Officer McLearin advised defendant that it was his right to have an attorney and that the interview was terminated. Defendant acknowledged at the suppression hearing the officers told him they had to terminate the interview and could no longer speak to him because he had requested an attorney. The officers testified that within approximately 30 seconds after the termination of the interview, defendant stated he would like to go ahead and talk to them, but Officer McLearin again explained to defendant that the interview was terminated and that they could not talk to him anymore because he had asked for an attorney. McLearin explained to defendant the only way they could talk would be for defendant to initiate the conversation and request to talk to them. According to the officers, defendant then stated he wanted to go ahead and tell his side of the story without an attorney. At the end of this untaped interview, Officer McLearin asked defendant to give a taped statement repeating what he had just told them, and defendant agreed. Officer McLearin then suggested they take a break at which time defendant was given food to eat and something to drink. At 12:18 a.m., after being given *Miranda* warnings again, defendant stated he understood he did not have to talk to the officers or give a statement. Defendant indicated he wanted to give a statement and then gave a tape-recorded confession, stating he shot the victim, took various items of jewelry, and threw the shotgun into the Carrier Mills reservoir. The interview was concluded about 12:39 a.m. at which time defendant was placed under arrest.

■ From our review of the record, we find that defendant unequivocally invoked his right to counsel, thereby necessitating a cessation of the questioning, and that defendant initiated further communication with the officers by his insistence on continuing the interview without an attorney after the officers repeatedly advised him they could not talk with him because of his request for an attorney. We also find the evidence amply supports the conclusion that defendant knowingly and intelligently waived his right to counsel after he initially indicated he chose to invoke that right. According to the undisputed testimony at the suppression hearing, the officers made no threats or promises to defendant, nor was there any coercion. Defendant admitted he was advised of his *Miranda* rights and testified he remembered signing the *Miranda* form before the 11:27 p.m. untaped interview and knew what the form was. He also admitted the officers did not force him to talk. Defendant, by his own admission, was aware of his right to remain silent and to have an attorney present, rights which he voluntarily waived. By looking at the totality of the circumstances, including the fact that defendant initiated further conversation with the officers, we conclude the trial court's finding that defendant did not knowingly and intelligently waive his right to counsel is manifestly erroneous. Accordingly, we reverse the order suppressing defendant's admission and confession and the physical evidence derived therefrom, and we remand this cause back to the trial court for further proceedings.

For the aforementioned reasons, we reverse the suppression order of the circuit court of Saline County and remand this cause for further proceedings.

Reversed and remanded.

WELCH and GOLDENHERSH, JJ., concur.